**Jeffrey GORMAN, Plaintiff,**

v.

**Floyd BARTCH,[1] et al., Defendants.**

**No. 95–0475–CV–W–3.**

United States District Court,
W.D. Missouri,
Western Division.

May 13, 1996.

---

**1.** In its April 1, 1996 Order, the Court concluded "that Plaintiff's First Amended Complaint names the individual defendants in both their individual and official capacities...." Pursuant to Fed. R.Civ.P. 25(d), Floyd Bartch is hereby substituted as a defendant in the place of Steven Bishop.

Michael L. Hodges, Crabtree Law Offices, P.A., Shawnee Mission, KS, John M. Simpson, John M. Simpson, Chartered, Kansas City, MO, and Connie Knight Sieracki, Lenexa, KS, for plaintiff.

Dale H. Close and Lisa Sander Morris, Kansas City Police Dept. Legal Advisor's Office, Kansas City, MO, for defendant.

## ORDER

SMITH, District Judge.

Pending before the Court is Defendants' Motion for Summary Judgment. As more fully set forth below, the Motion for Summary Judgment is GRANTED.

### I.  BACKGROUND [2]

Plaintiff suffers from paraplegia resulting from a severe spinal cord injury and is confined to a wheelchair. Late in the evening of May 30, 1992, Plaintiff was asked to leave a country-western bar in the Westport area of Kansas City; Plaintiff believes he was asked to leave the bar because he was in a wheelchair. Plaintiff left the bar but remained on the sidewalk outside the bar and solicited assistance from two officers of the Kansas City Missouri Police department ("KCMOPD"); however, instead of helping Plaintiff as he desired the officers arrested him.

A police van arrived at approximately 1:30 a.m. on May 31 to transport Plaintiff to the police station. The van was not equipped with a wheelchair lift or wheelchair restraints. Plaintiff was lifted from his wheelchair and placed on a bench inside the van. Plaintiff's physical condition prevented him from supporting himself on the bench, so Plaintiff's belt was used to tie his upper body to the wire mesh wall behind the bench. Once the van began moving, Plaintiff was unable to hold himself on the bench; at some time during the trip the belt broke and Plaintiff fell from the bench. As a result, Plaintiff suffered injuries to his back and shoulders.

The Amended Complaint does not set forth Plaintiff's claims in discrete counts, but appears to assert causes of action for violations

---

**2.** The facts recited in this section are set forth in the light most favorable to the Plaintiff and should not be construed as factual findings by the Court.

of the Rehabilitation Act, 29 U.S.C. § 794, and of the Americans with Disabilities Act, 42 U.S.C. § 12132 (the "ADA").[3] These claims are based upon the allegation that Plaintiff was not transported in a wheelchair-accessible vehicle, the lack of training and procedures for detaining and transporting handicapped arrestees, and the manner in which Plaintiff was detained and transported.[4]

## II. DISCUSSION

### A. Standards

■ A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See generally Williams v. City of St. Louis,* 783 F.2d 114, 115 (8th Cir.1986). In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588–89, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986); *Tyler v. Harper,* 744 F.2d 653, 655 (8th Cir.1984), *cert. denied,* 470 U.S. 1057, 105 S.Ct. 1767, 84 L.Ed.2d 828 (1985). However, a party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the ... pleadings, but ... by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

### B. ADA

■ Subchapter II of the ADA applies to Public Services and, in pertinent part, declares that "no qualified individual with a disability shall, by reason of such disability ... be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject-ed to discrimination by such entity." 42 U.S.C. § 12132. A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* § 12131(2).

Plaintiff contends that the broad language of § 12132 means that it is unlawful for a public entity (which includes KCMOPD; *see* 42 U.S.C. § 12131(1)(B)) to discriminate in any way against people based on their handicap. However, the ADA's scope is not as broad as Plaintiff contends; in order to be protected, Plaintiff had to be a "qualified individual with a disability," not simply a person with a disability. The term was specifically defined by Congress to describe a person who meets eligibility requirements for the receipt of services or participation in programs. It strains the statute to talk about Plaintiff's "eligibility" to be arrested and taken to jail or to "participate" in being arrested by the KCMOPD. To the extent there are "eligibility requirements" for being arrested, it seems those standards are established by laws defining crimes and the Fourth Amendment. Thus, had Plaintiff been arrested because he was handicapped, his arguments would more clearly satisfy the statutory requirements. *See, e.g., Jackson v. Town of Sanford,* 1994 WL 589617 (D.Me. 1994). This, however, is not his contention.

In *Torcasio v. Murray,* 57 F.3d 1340 (4th Cir.1995), the Fourth Circuit held that state prison officials were entitled to qualified immunity in a suit alleging violations of the ADA. Despite the different perspective presented when considering qualified immunity, much of the Fourth Circuit's reasoning easily transfers to the case at bar: a person who has been arrested "is not normally thought of as one who would have occasion 'to meet[ ] the essential eligibility requirements' for receipt of or participation in the services, pro-

---

3. Plaintiff had also sued various people in their individual capacities. Judgment has been entered on those claims through prior orders of the Court. Additionally, judgment has previously been entered in favor of the defendants on Plaintiff's claim of negligence.

4. Significantly, Plaintiff does not assert that he was arrested because of his handicap.

grams or activities of a public entity. The terms 'eligible' and 'participate' imply voluntariness on the part of an applicant who seeks a benefit from the state; they do not bring to mind [criminal suspects] who are being held against their will." *Id.* at 1347 (quotations in original). The Court shares the Fourth Circuit's view that these terms are ill-fitting, at best, in the context of arrested individuals, leading to the further conclusion that the ADA does not apply to the case at bar.

Plaintiff attempts to distinguish *Torcasio* by emphasizing that *Torcasio* involved a prison setting. Although this is an accurate distinction, it does not aid Plaintiff's cause. First, the statutory language remains the same; regardless of any similarities or differences between a prison setting and the circumstances involved here, the ADA's terms do not apply to the circumstances surrounding Plaintiff's arrest. Second, to the extent that the Fourth Circuit found it significant "that the management of state prisons is a core state function" requiring that "Congress ... speak unequivocally before ... [concluding] that it has 'clearly' subjected state prisons to its enactments," *id.* at 1345–46, the same arguments can be made with respect to the actions of local law enforcement authorities. Law enforcement is a core governmental obligation of state and local government, and Congress has not clearly indicated a desire to intrude upon the operations of local police departments to require changes in their vehicles and training requirements beyond narrow circumstances that are not applicable to the case at bar.

Through the course of this litigation Plaintiff has also emphasized the ADA's legislative history, which discusses certain types of police conduct. To the extent the legislative history discusses arrests of handicapped individuals, it evinces a concern that disability-related conduct (e.g., an epileptic seizure) is confused with criminal activity, leading to the arrest of the disabled individual. *E.g.,* H.R.Rep. No. 485(III), 101st Cong., 2d Sess. 50, *reprinted in* 1990 U.S.C.C.A.N. 267, 445, 473; *see also Jackson,* 1994 WL 589617. This describes a situation, as outlined above, wherein a person was arrested because of his disability; it does not describe the present situation, and Plaintiff has identified no part of the legislative history that clearly addresses the present situation.

Reliance on the legislative history is also hazardous because it is not clear. The paragraph above discusses the report of the House Committee on the Judiciary. Elsewhere, the House Committee on Education and Labor opined that the ADA "essentially simply extends the anti-discrimination prohibition ... to all actions of state and local governments." H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 84, *reprinted in* 1990 U.S.C.C.A.N. 303, 367. Of course, this is not what the statute actually says. More importantly, it demonstrates the hazard in relying on legislative history to determine the ADA's scope. Are the comments from the Judiciary Committee more persuasive because they specifically discuss arrests or because one would expect the Judiciary Committee to consider and discuss police conduct more readily than the Education and Labor Committee? Are the latter Committee's comments more applicable because they are more generally instructive of Congress'—or at least that Committee's—intent? And what of the thoughts of the third Committee to issue a report, which report does not contain any statements that appear relevant to the case at bar? *See* H.R.Rep. No. 485(I), 101st Cong., 2d Sess., *reprinted in* 1990 U.S.C.C.A.N. 267 (Report from the House Committee on Public Works and Transportation). The legislative history does not aid Plaintiff's case.

Plaintiff next points to various regulations promulgated by the Attorney General to interpret and implement the ADA. The regulations codified at 28 C.F.R. §§ 35.149, 35.150 and 35.151 (1992) relate specifically to "program accessibility," discuss only physical aspects of buildings, and have no relevance to the present situation. The general requirements, appearing in § 35.130, also do not apply to policies for arresting individuals. The only discussion of arrests occurs in the preamble to the final regulation, which does not aid Plaintiff. In pertinent part, the preamble acknowledges suggestions to enact a regulation requiring "training of law en-

forcement personnel to recognize the difference between criminal activity and the effects of seizures or other disabilities. . . ." 28 C.F.R. Pt. 35, App. A, at 449. However, because "[d]iscriminatory arrests and brutal treatment are already unlawful police activities," all that the regulations require is that "law enforcement personnel . . . make appropriate efforts to determine whether perceived strange or disruptive behavior or unconsciousness is the result of a disability." *Id.*

### C. The Rehabilitation Act

■ The Rehabilitation Act provides in pertinent part that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, . . . be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a). Relying on prior decisions interpreting similar language in other statutes, the Supreme Court declared that "[c]learly, this language limits the ban on discrimination to the specific program that receives the federal funds." *Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 636, 104 S.Ct. 1248, 1255, 79 L.Ed.2d 568 (1984) (citing *Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984) and *North Haven Bd of Ed. v. Bell,* 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982)). In response, *see* S.Rep. No. 64, 100th Cong., 2d Sess. 2–4, *reprinted in* 1988 U.S.C.C.A.N. 3, 3–5, Congress passed the Civil Rights Restoration Act of 1987 (the "Restoration Act"), which defines the phrase "program or activity" to mean "all of the operations of a department, agency, . . . or other instrumentality of a State or of a local government . . . any part of which is extended Federal financial assistance." 29 U.S.C. § 794(b)(1)(A). Plaintiff contends that the Restoration Act evinces Congress' desire to extend the Rehabilitation Act to any and every action taken by a recipient of federal funds. However, Congress' intent was to reverse the effects of *Consolidated Rail* and clarify that when an entity provides several programs and activities, the Rehabilitation Act applies to all such programs and activities so long as one or more of them receives federal funds. When read in conjunction with the other provisions of the Rehabilitation Act, the concept of "program or activity" does not readily encompass a police department's function of arresting lawbreakers and transporting them to the police station. The KCMOPD was not extending Plaintiff an opportunity to participate in a program, nor was it including him in an activity. *See Torcasio,* 57 F.3d at 1346–47. Similarly, Plaintiff was not applying for or requesting transportation to the police station.

Plaintiff also attempts to rely on language promulgated by the Department of Justice ("DOJ") to support his position. In 1980, the DOJ issued final regulations under the Rehabilitation Act. 45 Fed.Reg. 37620 (1980). In Appendix B to the final regulations (which is not codified in the Code of Federal Regulations), under a caption reading "Analysis of Final Rule," the DOJ discussed general matters relating to the regulation. Under Part C (captioned "Physical and Other Accessibility to Programs"), subsection 1 (captioned "Law Enforcement Agencies"), appear a series of "examples which . . . set forth a number of situations in which recipients are required under this subpart to provide auxiliary aids. . . ." Among the examples, which primarily detail instances of members of the public seeking varying forms of assistance, appears the following paragraph:

> If a hearing-impaired person is arrested, the arresting officer's *Miranda* warning should be communicated to the arrestee on a printed form approved for such use by the law enforcement agency where [there] is no qualified interpreter immediately available and communication is otherwise inadequate. The form should also advise the arrestee that the law enforcement agency has an obligation under Federal law to offer an interpreter to the arrestee without cost and that the agency will defer interrogation pending the appearance of an interpreter.

45 Fed.Reg. at 37630. Plaintiff argues that this example demonstrates that the DOJ has interpreted the Rehabilitation Act as bestowing rights upon arrested individuals. Plaintiff's argument might carry more force if this is actually what the DOJ had said. However,

in arguing from a specific example to a general rule of law, Plaintiff has not demonstrated that this is a valid interpretation. It is noteworthy that the DOJ did not promulgate a regulation that actually defines parameters of the Rehabilitation Act's application to arrestee's—yet has done so with painstaking care in other contexts. Finally, the obvious differences between insuring effective communication of a defendant's constitutional rights and the situation at bar demonstrates the hazard of relying on the general rule Plaintiff seeks to draw from this paragraph. The Court simply does not believe that the paragraph set forth above means that transporting validly arrested individuals constitutes a "program or activity" under the Rehabilitation Act.

### D.   CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. # 109) is GRANTED, and Judgment shall be entered in favor of the Defendants in their official capacities.

IT IS SO ORDERED.