Charles LEWIS and Daniel
Lewis, Plaintiffs,

v.

Officers Melody G. TRUITT, Individually,
Danny Joe McClure, Individually, John
Robert Rutherford, Individually, and the
City of Richmond, Defendants.

No. IP 96–0411–C–G/H.

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 19, 1997.

Michael K. Sutherlin, Law Office of Michael K. Sutherlin, Indianapolis, IN, for Charles Lewis, Daniel Lewis.

Robert M. Kelso, Kightlinger & Gray, Indianapolis, IN, for Meldoy G. Truitt, Danny Joe McClure, John Robert Retherford, City of Richmond, Unnamed Officers.

### ORDER

GODICH, United States Magistrate Judge.

This cause comes before the Court on Defendants' Motion for Partial Summary Judgment, Plaintiffs' Opposition thereto, and Defendants' Reply to Plaintiffs' Opposition.

Having considered the foregoing and being duly advised, the Court hereby GRANTS Defendants' Motion in part and DENIES Defendants' Motion in part as detailed below.

## I. Background

The relevant facts of this case, as construed in the light most favorable to Plaintiff, are as follows:

On the morning of August 13, 1994, Jacqueline Weaver, the girlfriend of David Lewis, committed suicide by hanging in Richmond, Indiana. She left behind a nine month old child, Amanda Lewis, whom David Lewis claims is his child. Following an investigation of the suicide, Richmond City Police Detective Jon Carrico left Amanda in David Lewis' custody.

Plaintiff Charles Lewis lived at 117 South 14th Street in Richmond, Indiana. David Lewis was at this address with family and friends mourning the death of Jacqueline Weaver during the late afternoon of August 13, 1994. Also present at the home were Plaintiff Daniel Lewis, Jennifer Leedy ("Leedy"), Stacey Sneed ("Sneed"), Christopher Anderson and others.

While this gathering was taking place, Defendants Truitt, McClure, and Retherford, all Richmond city police officers, arrived at Charles Lewis' home. The officers came to the address in order to take Amanda Lewis to police headquarters where an agent of Child Protective Services would be contacted to make a custody placement determination. Earlier that day, Amanda's maternal grandmother had contacted the Richmond City Police Department and requested that custody of Amanda be given to her.

The officers had not obtained a court order or a warrant prior to arriving at Charles Lewis' home. They had made no independent determination that Amanda was in need of services and made no effort to contact Detective Jon Carrico regarding the child's well-being.

Shortly after the officers arrived, they were met outside the home by Leedy, Sneed, and David and Charles Lewis. The officers explained the situation to David Lewis, who decided to cooperate with them. He told them that he would go inside and get Amanda and would accompany them to the police department. During this time, Charles Lewis expressed his belief that David should not comply with the officer's request because he believed that the officers needed to have authority to remove the child from the custody of David Lewis. The officers told David and Charles that no warrant was necessary because David had kidnapped his child.

After David Lewis entered the house, the officers attempted to speak with Charles Lewis. Sneed and Leedy tried to explain to the officers that Charles was deaf and that the best way to communicate with him was to write down questions on a piece of paper. Officer Truitt in particular refused to believe that Charles was deaf and would not write down any questions for him.

Defendants have conceded for the purposes of their Motion that Plaintiff Charles Lewis is deaf. See Defendants' Brief in Support of Motion for Partial Summary Judgement ("Defendants' Brief in Support") at 1. None of the officers attempted to communicate with Charles Lewis on paper, even though at least one of the officers should have known that he was deaf (Defendant Retherford had come to Charles Lewis' home to help set up communications via teletype with the 911 emergency system). Before David Lewis returned with Amanda, Charles Lewis, Sneed, and Leedy went back into the house. They did not invite the officers inside. Despite this fact, the officers entered the home.

Upon entering the home, Defendants Truitt and McClure allegedly physically assaulted Charles Lewis. They pulled him to the floor by his hair, handcuffed him, placed him under arrest, and proceeded to kick and hit him. Charles suffered bruises, contusions, and severe internal injuries. This force was used on Charles even though Sneed and Leedy warned the officers repeatedly that Charles was deaf and could not hear their instructions. Defendant Truitt allegedly used abusive and inappropriate language to convey her belief that they were lying and that Charles really did know what she was saying.

Leedy also warned the officers that Charles had recently undergone extensive surgery for cancer which had left a large incision on his abdomen. The stitches that had held this incision closed had recently been removed. Handcuffing Charles stretched and opened the incision, which had to be re-stitched with the aid of a mesh insert. Leedy also offered to prove that Charles Lewis was deaf by contacting the teletype system connected by the telephone to 911, which had been set up in case of an emergency. Officer Truitt told Leedy to shut-up and threw her into a large piece of furniture.

Defendants arrested Charles Lewis and charged him with Resisting Law Enforcement, a Class A Misdemeanor. On March 27, 1996, Plaintiffs filed this action against Defendants alleging violations of 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), and state law. Defendants have moved for partial summary judgment on Plaintiff's ADA claims.

## II. Analysis

When deciding a motion for summary judgment, the Court must "consider all facts in the light most favorable to the nonmovant, resolving all inferences in his favor." *Vitug v. Multistate Tax Comm'n,* 88 F.3d 506, 511 (7th Cir.1996) (citations omitted) Furthermore,

> [u]nder Fed.R.Civ.P. 56(c), summary judgment is warranted only if there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law. The initial burden of production rests with the moving party to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Once the moving party satisfies this burden, the nonmovant must set forth specific facts showing that there is a genuine issue for trial. The nonmovant fails to demonstrate a genuine issue for trial [w]here the record taken as a whole

could not lead a rational trier of fact to find for the non-moving party.

*Id.* at 511–12 (quotations omitted).

■ Title II of the ADA prohibits state and local entities from discriminating against any qualified individual with a disability in programs, services, and activities. 42 U.S.C. § 12132.

> To establish a violation of Title II, [a] plaintiff must show: (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

*Tyler v. City of Manhattan,* 857 F.Supp. 800, 817 (D.Kan.1994).

Defendants concede that Charles Lewis has a disability, but argue that he was not a qualified individual within the meaning of the ADA. Defendants' Brief in Support at 2.

> The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to the rules, policies, or practices, removal of architectural, communication or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in the programs or activities provided by a public entity.

42 U.S.C. § 12131. "The term was specifically defined by Congress to describe a person who meets eligibility requirements for the receipt of services or participation in programs." *Gorman v. Bartch,* 925 F.Supp. 653, 655 (W.D.Mo.1996).

Plaintiffs contend that Charles Lewis was entitled to be informed concerning the child protective services which Defendants were providing. Plaintiffs' Response in Opposition to Defendants' Motion for Partial Summary Judgment ("Plaintiffs' Opposition") at 9. Defendants disagree. Defendants' Reply Brief to Plaintiffs' Response in Opposition to Defendants' Motion for Partial Summary Judgment ("Defendants' Reply") at 2.

Indiana Code § 31–6–11–10(a) provides that "[e]ach county department of public welfare shall establish within itself a local child protection service." The purpose of this provision and the other provisions of Indiana Code chapter 31–6–11 is:

> to encourage effective reporting of suspected or known incidents of child abuse or neglect, to provide in each county an effective child protection service to quickly investigate reports of child abuse or neglect, to provide protection for such child from further abuse or neglect, and to provide rehabilitative services for such a child and his parent, guardian, or custodian.

I.C. 31–6–11–1.

Chapter 11 does not specify who is "eligible" to participate in child protective services. It is evident from Ind.Code § 31–6–11–1, however, that child protective services are intended to protect children from abuse or neglect. In addition, child protective services also provide rehabilitative services for a child and "his parent, guardian, or custodian." *Id.* Indiana Code 31–6–1–2 defines "parent" as "the biological or adoptive parent. Unless otherwise specified, it includes both parents, regardless of their marital status." *Id.*

Charles Lewis claimed to be Amanda Lewis' grandfather. See Plaintiffs' Opposition at 9. The definition provided by I.C. 31–6–1–2 of parent does not include grandparents. Also, Charles Lewis does not claim to be Amanda Lewis' guardian or custodian. Therefore, Charles Lewis is not a person to whom the legislature intended for local child protective services to provide services and he could not have met the eligibility requirements necessary to become a qualified individual within the meaning of the ADA. Thus, to the extent that Plaintiffs base their ADA claim on Defendants' failure to include Charles Lewis in their provision of child protective services to Amanda Lewis, the Court GRANTS Defendants' Motion for Partial Summary Judgment.

■ While it is true that plaintiff Charles Lewis lacked the right to be consulted on or even informed about the officer's intentions concerning the provision of child protective services to Amanda Lewis, he most assuredly had the right to be informed by what authority the officers had come upon his property and by what authority they were entering his house.

■ When considering the ADA, the House Judiciary Committee stated:

> In order to comply with the non-discrimination mandate, it is often necessary to provide training to public employees about disability. For example, persons who have epilepsy, and a variety of other disabilities, are frequently inappropriately arrested and jailed because police officers have not received proper training in the recognition of and aid of seizures. Such discriminatory treatment based on disability can be avoided by proper training.

H.R.Rep. No. 101–485, pt. III, 101st Cong., 2nd Sess. 50, *reprinted in* 1990 U.S.C.C.A.N. 473. In light of this statement, Courts have held that a plaintiff may recover under the ADA where he can show that (1) he was disabled, (2) the defendants knew or should have known he was disabled, and (3) the defendants arrested him because of legal conduct related to his disability. *See e.g., Barber v. Guay,* 910 F.Supp. 790, 802 (D.Me. 1995) (holding that the defendant was not entitled to summary judgment on the Plaintiffs' "claims [under the ADA] that he was denied proper police protection and fair treatment due to his psychological and alcohol problems"); *Jackson v. Inhabitants of the Town of Sanford,* No. 94–12–P–H, 1994 WL 589617, at *6 (D.Me. Sept.23, 1994) (holding that the Defendant was not entitled to summary judgment on the Plaintiffs' claim that Defendants mistakenly arrested him for drunk driving when Plaintiff told the officers that he had been disabled by a stroke); *accord., Gorman v. Bartch,* 925 F.Supp. 653, 656 (W.D.Mo.1996) (holding that the plaintiff could not recover under the ADA for being transported to jail in a police vehicle not equipped for disabled persons, but distinguishing cases in which "disability-related conduct (e.g., an epileptic seizure) is confused with criminal activity, leading to the arrest of the disabled individual").

Plaintiffs argue that Defendants knew Charles Lewis was deaf but refused to take

steps to communicate with him and then arrested him because he did not respond to them appropriately. Plaintiffs' Opposition at 13. Defendants have cited to no evidence to contradict this argument. Accordingly, a genuine issue of material fact exists on the question of whether Defendants arrested Plaintiff because of his disability, and Defendants' Motion for Summary Judgment must be DENIED as to Plaintiffs' claim that Defendants arrested Charles Lewis because of his disability.

### III. Conclusion

It is therefore ordered that Defendants' Motion for Summary Judgment GRANTED in part and DENIED in part as detailed above.