**F I L E D**

PUBLISH

**AUG 3 1999**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

JEANNE GOHIER, individually and as personal representative for the Estate of Michael Lucero,

Plaintiff-Appellant,

v.

GARY ENRIGHT; CITY OF COLORADO SPRINGS, a Colorado municipal corporation,

Defendants-Appellees.

No. 98-1149

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 97-WY-925-WD)**

---

Patric J. LeHouillier, of LeHouillier & Associates (Alexanderia Mason with him on the brief), Colorado Springs, Colorado, for Plaintiff-Appellant.

Thomas J. Marrese, Senior Litigation Attorney for the City of Colorado Springs, Colorado, (Patricia K. Kelly, City Attorney, with him on the brief), for Defendants-Appellees.

---

Before **BALDOCK**, **KELLY**, and **MURPHY**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

Jeanne Gohier, representing the estate of Michael Lucero, appeals two orders of the district court. Those orders had the combined effect of completely dismissing the estate's suit against the city of Colorado Springs and one of its police officers, Gary Enright, who had fatally shot Lucero.

In its first order, the court granted summary judgment to Enright and the City on Gohier's § 1983 claims. It held that Enright was qualifiedly immune to an excessive-force claim, and that, because he had not violated Lucero's federal rights, the City could not be liable under § 1983 for having a policy, custom, or practice that caused a violation of federal rights. This court **AFFIRMS** that order in its entirety for substantially the reasons stated in the order.

In the second order, the court affirmed a magistrate judge's denial of Gohier's motion to amend her complaint. Gohier sought to add a claim that the City had violated Title II, Subchapter A of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134, by failing to treat and protect Mr. Lucero in light of his disability, paranoid schizophrenia, which contributed to the very unfortunate end of his encounter with Officer Enright. The magistrate concluded that amendment would be futile, as Gohier could not as a matter of law state an ADA claim. The district court affirmed on the same ground, after slightly qualifying the magistrate's explication. This court **AFFIRMS** the district court's ruling, but for different reasons, which require some discussion.

I.    FACTS AND PROCEEDINGS

Shortly after midnight, Officer Enright responded to a dispatcher's request to investigate a disturbance on Nevada Avenue. The dispatcher reported that a man on foot had hit a caller's vehicle with a baseball bat, and that another caller complained the man was breaking car windows with a pipe. The dispatcher gave a description of the man.

Soon after the report, Enright was driving south down Nevada in the vicinity of the incidents when he saw Lucero, who did not match the description, walking south down the middle of the avenue. The area had no streetlights. Enright pulled over, turning on his highbeams and overhead flashing lights. Lucero kept walking, with his right hand clutched to his chest.

Enright got out of his car, leaving it idling. He had a nightstick, pepper spray, a pistol, and a lapel microphone with which he could talk to the dispatcher. According to Enright, the following events all transpired in the 20 to 30 seconds after he left the car.

Enright identified himself and asked Lucero to talk to him. Lucero, however, kept walking. Enright yelled, "Police, stop!" Lucero then stopped, 30 to 35 feet from Enright, put his right hand behind his back, and began walking toward Enright at a "fast pace." Enright described him as "crazed and wild-eyed," with his teeth gritted in a grimace and a "Charles Manson–type look."

Enright did not call for backup. He drew his pistol, pointing it at a 45 degree angle at the ground between himself and Lucero. Although he ordered Lucero to show his hands, Lucero kept walking quickly toward him with his right hand hidden. Enright then leveled his pistol at Lucero and again shouted at him to show his hands.

Still advancing, Lucero raised his right hand from behind his back and began repeatedly swinging it down and forward in a stabbing motion. He held a long, slender object that Enright thought was a knife. Around this time, Enright decided that Lucero was mentally ill. He also decided to retreat five to seven feet behind his car, while repeatedly ordering Lucero to "drop the knife" or "drop it."

Lucero did not do so, but instead advanced to the driver's side door of the car. He was at this point no longer in the area illuminated by the car's headlights. He stopped and said, "Do you like your car? It's gone." When he began to open the car door, Enright moved forward to stop him. Lucero then let go of the door and either stepped or lunged toward Enright, making a stabbing motion with the object. Enright shot him twice, killing him.

Gohier, as representative of Lucero's estate and on her own behalf, filed a complaint stating § 1983 excessive-force and failure-to-train claims, with pendent negligence claims, against Enright and Colorado Springs. After defendants moved for summary judgment, she moved to amend her complaint to add a claim under Title II of the ADA. The district court designated a magistrate judge to

-4-

hear and determine the motion to amend.  *See* 28 U.S.C. § 636(b)(1)(A).  The magistrate judge denied the motion by written order, and Gohier moved the district court to reconsider.  *See id.*  The court reviewed the order, determined that it was not clearly erroneous or contrary to law, and affirmed it.

II.     DISCUSSION

A.      Standard of Review

This court reviews the district court's refusal to grant Gohier leave to amend her complaint for an abuse of discretion.  *See, e.g.*, *Jefferson County Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 858–59 (10th Cir. 1999).  The district court rested that refusal, however, not on any discretionary ground, but solely on the legal ground that the amendment would have been futile.[1]  A proposed amendment is futile if the complaint, as amended, would be subject to dismissal.  *See id.* at 859.  The futility question is functionally equivalent to the question whether a complaint may be dismissed for failure to state a claim, a question this court reviews *de novo.  See, e.g.*, *Chemical Weapons Working Group, Inc. v. United States Dep't of the Army*, 111 F.3d 1485, 1490

---

[1]The magistrate judge had noted in his order that the amendment would likely confuse the jury and prejudice the defendants.  The magistrate rested his order, however, on futility: "The Plaintiffs' motion to amend . . . is appropriately denied on the grounds of futility.  Accordingly, Plaintiffs' motion to amend complaint is DENIED."  More importantly, the district court's order affirming the magistrate described the latter's denial of leave as "based on a determination that [amendment] would prove to be futile."  The district court's order addressed only futility.

(10th Cir. 1997) (noting *de novo* review of dismissal for failure to state claim); *see also, e.g.*, *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999) (noting that, to extent denial of leave to amend based on futility, court of appeals reviews *de novo*); *Martin v. Associated Truck Lines, Inc.*, 801 F.2d 246, 248–49 (6th Cir. 1986) (same).  "A district court by definition abuses its discretion when it makes an error of law."  *Koon v. United States*, 518 U.S. 81, 100 (1996).

B. Analysis

1. *Statutory Framework*

Title II of the ADA commands that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The ADA broadly defines a "qualified individual with a disability" as anyone who "meets the essential eligibility requirements for the receipt of services or . . . participation in programs or activities provided by a public entity."  *Id.* § 12131(2).

## 2. *The Magistrate's and District Court's Reasoning*

In evaluating Gohier's proposed claim under Title II of the ADA, the magistrate applied the general standard of *Tyler v. City of Manhattan*, 849 F. Supp. 1429 (D.Kan. 1994). That standard requires a plaintiff to prove:

> (1) that he [or she] is a qualified individual with a disability;
>
> (2) that he [or she] was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and
>
> (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

*Id.* at 1439. This general standard, which closely tracks the statute's language, is plainly correct. *See Weinreich v. Los Angeles County Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir.), *cert. denied*, 118 S. Ct. 423 (1997) (stating essentially identical test). Colorado Springs does not contest that it is a public entity, or that Lucero had a disability. That leaves two potentially relevant questions: did the city, by reason of Lucero's disability, either (1) exclude him from participating in or deny him the benefits of services, programs, or activities whose essential eligibility requirements he met, or (2) otherwise subject him to discrimination?

The magistrate did not frame the inquiry in terms of those two questions. Instead, in addressing *Tyler*'s second branch, the magistrate adopted the reasoning of an unpublished district court opinion holding that "the individual [police] protection of a particular person or . . . class of persons is not . . . a municipal

service, benefit, or program." *Amirault v. City of Roswell*, No. 6:95–CV–422, 1996 WL 391986, at *6 (D.N.M. July 11, 1996).

*Amirault* involved a Title II claim by a man with whom City police officers had spoken, fearing that he was a suicide risk, but whose assurances that he had changed his mind convinced them to let him go. *See id.* at *1. He soon thereafter tried to kill himself. *See id.* He later sued the City under the ADA, arguing that the police had violated his right to protection (from himself) by not arresting and involuntarily committing him for mental-health evaluation. *See id.* at *2. The court held that his claim failed under *Tyler*'s second branch. *See id.* at *5–6. It relied on three overlapping rationales: no one has a right to be involuntarily committed for protection from himself; the State has no affirmative duty to protect any person not in its custody; and police protection is not an individualized benefit whose denial can be actionable. *See id.* The court thus held that "the City . . . had no duty to protect Plaintiff from himself . . ., nor was Plaintiff denied a municipal or police service, benefit, or program to which he or any other individual or class of individuals was entitled." *Id.* at *6.

The magistrate in this case focused on the rule stated in the latter half of that holding, i.e., that police protection is not a "municipal service, benefit, or program." He concluded that this rule bars Gohier's proposed ADA claim, which arose from police interaction with Lucero, as a matter of law.

Gohier pointed out to the district court that opinions from outside this circuit establish a more specifically relevant test for Title II claims arising from arrests. *See Lewis v. Truitt*, 960 F. Supp. 175, 178 (S.D.Ind. 1997) ("Courts have held that a plaintiff may recover under the ADA where he can show that (1) he was disabled, (2) the defendants knew or should have known that he was disabled, and (3) the defendants arrested him because of legal conduct related to his disability." (citing *Barber v. Guay*, 910 F. Supp. 790, 802 (D.Me. 1995)); *Jackson v. Town of Sanford*, No. 94–12–P–H, 63 U.S.L.W. 2351, 3 A.D. Cases 1366, 7 A.D.D. 211, 1994 WL 589617, at *6 (D.Me. Sept. 23, 1994). The district court did not deny that *Lewis*'s test is more appropriate, instead holding only that the magistrate's decision to apply *Tyler* instead of *Lewis* had not been "contrary to law or clearly erroneous." That conclusion, however, was a *non sequitur*: the *Lewis* test is not an alternative to *Tyler*, but a specific application of the general standard set forth in *Tyler*. Indeed, the *Lewis* court itself quoted and applied *Tyler*. *See Lewis*, 960 F. Supp. at 177.

The propriety of the magistrate's ruling really turns on the second step of his analysis: applying very broadly *Amirault*'s comment that police protection is not an individualized benefit of a public entity's "services, programs, or activities," as required by the ADA. Even assuming *arguendo* the correctness of that debatable comment, the problem with the magistrate's approach is that it ignored the second basis for a Title II claim. As noted above, Title II commands

that Lucero not "be excluded from participation in or be denied the benefits of the services, programs, or activities of [Colorado Springs], *or* be subjected to discrimination by [Colorado Springs]."  42 U.S.C. § 12132 (emphasis added).

The initial question is thus whether *Lewis*, on the one hand, or *Amirault*, as broadly read by the magistrate, correctly decided whether a person with a disability can state a claim under the ADA based on police conduct in an arrest or investigation.  In reviewing the magistrate's order, the district court held that, while *Amirault's* facts are distinguishable, the quoted principle is not.  The court thus concluded that denying leave to amend based on *Amirault* was not "clearly erroneous or contrary to law."

3.    *The Scope of the ADA's Applicability to an Arrest or Investigation*

*Amirault* invoked a rule that police protection is not an individualized benefit in addressing a narrow claim, i.e., that the ADA affirmatively obliged police to protect a person from his own actions, which were caused by that person's disability.  In this case, the magistrate and district court divorced *Amirault*'s invocation of that rule from its narrow context and apparently converted it into a broad rule barring any Title II claim arising from an arrest or related police interaction involving a person with a disability.[2]

_____

[2]This opinion broadly uses the term "arrest" to include several different scenarios:  arrests; investigations potentially involving an arrest, as in *Amirault;* and violent confrontations not technically involving an arrest, as in this case.

-10-

Federal courts have addressed Title II claims arising from arrests under two different theories. *See generally Patrice v. Murphy*, 43 F. Supp.2d 1156, 1158–60 (W.D.Wash. 1999) (surveying cases). The first is that police wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity. *See Lewis*, 960 F. Supp. at 176–77; *Jackson*, 1994 WL 589617, at *1. The second is that, while police properly investigated and arrested a person with a disability for a crime unrelated to that disability, they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees. *See Gorman v. Bartch*, 152 F.3d 907, 912–13 (8th Cir. 1998) (holding such claim viable); *Rosen v. Montgomery County*, 121 F.3d 154, 157–58 (4th Cir. 1997) (suggesting in *dicta* such claim not viable); *Patrice*, 43 F. Supp.2d at 1160 (holding such claim not viable).

This case is logically intermediate between the two archetypes envisioned by those theories. Officer Enright did not use force on Mr. Lucero because he misconceived the lawful effects of his disability as criminal activity, inasmuch as Lucero's assaultive conduct was not lawful. Neither did Enright fail to accommodate Lucero's disability while arresting him for "some crime unrelated to his disability." *See Patrice*, 43 F. Supp.2d at 1159. Instead, Enright used force on Lucero while Lucero was committing an assault related to his disability.

-11-

This court need not decide whether this case is better analyzed under a wrongful-arrest or reasonable-accommodation-during-arrest theory. Even assuming both theories are viable, the first does not apply to the facts of this case, and Gohier has expressly declined to invoke the second. Accordingly, this court merely clarifies that a broad rule categorically excluding arrests from the scope of Title II, like the rule derived from *Amirault* by the district court in this case, is not the law. It remains an open question in this circuit whether to adopt either or both the wrongful-arrest theory of *Lewis* and *Jackson* and the reasonable-accommodation-during-arrest theory of *Gorman*.

4.      *Wrongful-Arrest Theory*

In two opinions on which Gohier relies, district courts declined to dismiss ADA claims alleging that police had arrested, and, in one case, beaten, persons with disabilities who had not committed any crime. *See Lewis*, 960 F. Supp. at 176–77; *Jackson*, 1994 WL 589617, at *1.[3] *See generally* James D. Johnson, Note & Comment, *Does the Americans with Disabilities Act Apply to the Conduct of Law Enforcement Officers Pursuant to Arrests? A Survey of* Gorman v. Bartch,

---

[3]Gohier also relies on *Barber v. Guay*, 910 F. Supp. 790, 802 (D.Me. 1995). Police arrested and used force on Barber, who had or was regarded as having a mental disability, in resolving a trivial dispute between him and his landlord over a wheelbarrow. *See id.* at 796, 802. In the brief part of its opinion declining to dismiss Barber's ADA claim, the court did not specify how the police may have violated Title II in his arrest. *See id.* at 802. The ADA discussion is cursory, as it serves only to reject a misguided argument that, because Barber was not an employee under ADA's Title I, the ADA did not apply at all. *See id.* *Barber* thus offers little help in deciding when Title II claims are viable in an arrest context.

14 Ga. St. U. L. Rev. 901, 920–22 (1998) (discussing cases). The police in each case misperceived the effects of a disability as illegal conduct. In *Lewis*, they beat and arrested, for the offense of resisting law enforcement, a deaf man who could not understand their commands; in *Jackson*, they arrested for drunk driving a man who was sober, and whose unsteadiness and slurred speech resulted from a past stroke. *See* 960 F. Supp. at 176–77; 1994 WL 589617, at *1. The court in each case relied on a passage in the ADA's legislative history to conclude that a person with a disability can state a claim for such mistreatment:

> In order to comply with the non-discrimination mandate, it is often necessary to [train] public employees about disability. For example, persons who have epilepsy, and a variety of other disabilities, are frequently inappropriately arrested and jailed because police officers have not received proper training in [how to recognize and aid people having] seizures. . . . Such discriminatory treatment based on disability can be avoided by proper training.

H.R. Rep. No. 101–485, pt. III (1990), *reprinted in* 1990 U.S.C.C.A.N. 445 (quoted at 960 F. Supp. at 178; 1994 WL 589617, at *6 n.12).

In this case, Officer Enright did not misperceive lawful conduct caused by Mr. Lucero's disability as criminal activity and then arrest him for that conduct. Lucero's conduct was not lawful, and Enright did not arrest him. Enright used force on Lucero not to effect an arrest, but to defend himself from a perceived threat. When he shot Lucero, he reasonably thought it necessary to do so to avoid serious harm or death. We take judicial notice that Lucero may not have been

criminally responsible under Colorado law for his unlawful conduct,[4] and assume that said conduct was the unfortunate result of a "disability" in terms of the ADA. Nonetheless, whether or not Enright would have formally arrested Lucero, had that been possible, and whether or not a jury would ultimately have convicted Lucero of any crime, Enright's use of force in self-defense is simply unlike the wrongful arrests of Lewis and Jackson. Those men's conduct did not warrant the police response at issue in those cases, i.e., arrest. Lucero's threatening conduct, however, did warrant the police response at issue in this case, i.e., the use of force in self-defense.

5. *Reasonable-Accommodation-During-Arrest Theory*

As noted above, the Eighth Circuit has held that Title II can apply to arrests in a different type of case than the wrongful-arrest scenario of *Lewis* and *Jackson*. *See Gorman*, 152 F.3d at 912–13 (reversing dismissal of ADA suit alleging police had discriminated against arrestee with disability by transporting him to police station in vehicle unequipped to safely accommodate people using wheelchairs). Under *Gorman*'s rationale, Gohier might have argued that Title II required Colorado Springs to better train its police officers to recognize reported

---

[4]*See* Colo. Rev. Stat. §§ 16–8–101.5, –103, –104.5, –105.5 (1999) (governing crimes committed after June 1995); *see also, e.g.*, *People v. Chavez*, 629 P.2d 1040, 1047 (Colo. 1981) (*en banc*) (explaining that one who pleads not guilty by reason of insanity "'admits the acts charged, but denies criminal culpability'" on grounds that "mental disease or defect . . . relieves him of criminal responsibility for his conduct" (quoting *Leick v. People*, 322 P.2d 674, 681 (1958))).

disturbances that are likely to involve persons with mental disabilities, and to investigate and arrest such persons in a manner reasonably accommodating their disability. Gohier, however, did not make any such argument under the ADA below and, on appeal, affirmatively disclaimed reliance on the theory advanced by the plaintiff in *Gorman*. This court thus expresses no opinion on whether a reasonable-accommodation-during-arrest theory could extend to the facts of this case.

III.    CONCLUSION

This court AFFIRMS the district court's order granting defendants summary judgment on Gohier's § 1983 claims for substantially the reasons stated in that order, and AFFIRMS the order denying Gohier leave to amend her complaint to allege a claim under the ADA for the reasons discussed above.