Odis TUCKER, Vonnie Tucker,
Blake Tucker and Lauren
Tucker, Plaintiffs,

v.

State of TENNESSEE; Hardin County,
Tennessee; and City of Savannah
Police Department, Defendants.

No. 05–1046–T/AN.

United States District Court,
W.D. Tennessee,
Eastern Division.

Aug. 14, 2006.

Brandon O. Gibson with Pentecost, Glenn & Rudd PLC in Jackson, for Hardin County, Tennessee.

Dale Conder, Jr. with the firm of Rainey, Kizer, Reviere & Bell, PLC in Jackson, for The City of Savannah, Tennessee.

## ORDER GRANTING SUMMARY JUDGMENT TO CITY OF SAVANNAH POLICE DEPARTMENT

TODD, District District Judge.

The plaintiffs, Odis Tucker, Vonnie Tucker, Blake Tucker and Lauren Tucker, brought this action pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, against the State of Tennessee, Hardin County, Tennessee [1] and the City of Savannah Police Department.[2] Plaintiffs allege that

---

1. The Court issued an order granting the State of Tennessee's motion to dismiss on August 2, 2005. Summary judgment was granted in favor of Hardin County on August 10, 2006.

2. The City of Savannah is the appropriate defendant, as the "City of Savannah Police Department" is not a suable entity that is separate from the City itself.

each of them is a qualified individual with a disability and that the defendants discriminated against them and denied their right to accommodation under the ADA during an incident that occurred on February 29, 2004 and during the ensuing proceedings in Hardin County General Sessions Court. They seek compensatory damages, attorney fees and expenses. Before the Court is a motion for summary judgment filed on behalf of the City of Savannah (the "City").[3] Plaintiffs have filed a response to the motion.

Motions for summary judgment are governed by Fed.R.Civ.P. 56. If no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. Fed.R.Civ.P. 56(c). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The opposing party may not rest upon the pleadings but must go beyond the pleadings and "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548.

"If the defendant ... moves for summary judgment ... based on the lack of proof of a material fact, ... [t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, the Court's function is not to weigh the evidence, judge credibility, or in any way determine the truth of the matter but only to determine whether there is a genuine issue for trial. *Id.* at 249, 106 S.Ct. 2505. Rather, "[t]he inquiry on a summary judgment motion ... is ... 'whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law.' " *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. 2505). Doubts as to the existence of a genuine issue for trial are resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Title II of the ADA provides:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. *See Tennessee v. Lane*, 541 U.S. 509, 516–17, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004). The term "public entity" includes state and local governments, as well as their departments, agencies and instrumentalities. § 12131(1). A "qualified individual with a disability" is defined as:

an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in

---

**3.** Vonnie Tucker asserted claims only against the State of Tennessee and Hardin County. Therefore, her claims are not addressed in the City's motion.

programs or activities provided by a public entity.

§ 12131(2). In order to establish a prima facie under Title II, a plaintiff must show that he or she (1) has a disability, (2) is otherwise qualified, and (3) is "being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely because of [his or] her disability." *Dillery v. City of Sandusky*, 398 F.3d 562, 567 (6th Cir.2005) (quoting *Jones v. City of Monroe*, 341 F.3d 474, 477 (6th Cir.2003)). Compensatory damages may be recovered under the ADA only if the plaintiffs prove intentional discrimination. *See Nieves–Marquez v. Puerto Rico*, 353 F.3d 108, 126 (1st Cir.2003); *Delano–Pyle v. Victoria County, Tex.*, 302 F.3d 567, 574 (5th Cir. 2002), *cert. denied*, 540 U.S. 810, 124 S.Ct. 47, 157 L.Ed.2d 22 (2003); *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir.1999); *Center v. City of West Carrollton*, 227 F.Supp.2d 863, 871 (S.D.Ohio 2002).

Plaintiffs Odis Tucker ("Odis"), Blake Tucker ("Blake") and Lauren Tucker ("Lauren") are deaf and mute. Blake and Lauren are husband and wife. The evidence in the record shows that, at some point during the evening of Sunday, February 29, 2004, City police officers Mike Pope, John Sylvester and T.J. Barker responded to a possible domestic disturbance call at 90 Canby Circle in Savannah, Tennessee, the home of Lauren mother, Donna Spears ("Donna"). Lauren had been

visiting her mother for a few days prior to the incident; she had Kayla Tucker, the infant daughter of Lauren and Blake, with her as well. Odis and Blake arrived in Savannah unexpectedly[4] to pick up Lauren and the baby, intending for all of them to return to their home in Alabama. It is unclear who then called the police, but the parties have speculated that it was one of Donna's neighbors.

Officer Pope was the first to arrive at the scene. He had been called to the 90 Canby Circle address in the past; therefore, he knew Lauren and her mother, and knew Lauren was deaf and mute. When he arrived, Pope saw a maroon van parked on the street and saw Odis and Blake outside using sign language, so he got a pad and a pen in order to communicate with them in writing.[5] Donna, who is not mute or hearing disabled, came out of her house and told Pope that Lauren did not want to leave with Blake and Odis. Pope instructed Donna to go back inside and then communicated in writing with Blake and Odis. There is disputed testimony regarding the substance of that communication.[6] In any event, Pope then went inside the house to find out what Lauren had to say, telling Blake and Odis to wait outside. At about this time, Officers Sylvester and Barker also arrived on the scene. Barker went inside, while Sylvester stayed outside with Blake and Odis.

Inside the house, Donna repeated the statement that Lauren did not want to

---

**4.** Blake was not supposed to pick Lauren up until the next day, Monday.

**5.** Lauren and the baby were at the Shanks' house, a neighbor across the street, when Blake and Odis arrived. Blake walked over to find Lauren, followed by Donna Spears. Donna, Lauren, and Blake, who was carrying the baby, then walked back across the street together to Donna's house. Donna and Lauren went inside, and that seems to have been when Pope arrived on the scene. Blake

handed the baby to Odis, but neither Blake nor Odis went into Donna's house.

**6.** Pope testified in his deposition that Odis wrote that Donna would not let Lauren and the baby leave. (Pope Dep. at 24–25.) However, in his deposition, Blake stated that he told Pope only that he did not know what was going on. (B. Tucker Dep. at 19.) Odis denied exchanging any written communication with the police. (O. Tucker Dep. at 13.)

leave with Blake. Pope testified that Lauren at first refused to communicate with him in writing, but then agreed to do so if her mother left the room, which she did. (Pope Dep. at 26–27.) Pope stated that Lauren first indicated that she did not want to leave Savannah, but then changed her mind and stated that she would leave with Blake and Odis. *Id.* at 27.

Lauren testified that she repeatedly asked for an interpreter, but that Pope ignored her requests. She stated that she told Pope she wanted to leave with her husband, but that her mother and Pope then began talking and she could not tell what they were saying. (L. Tucker Dep. at 14–16.) However, regardless of this differing testimony, it is undisputed that when Lauren assured Pope that she wished to leave with Blake and Odis, the officers did not attempt to stop her. Lauren was allowed to gather her things and leave the house, with the officers escorting her to the van.

The testimony of the plaintiffs regarding the events of the next few minutes is very confused. Nevertheless, the plaintiffs do not dispute that at some point Pope believed he saw Blake strike Judy Crotts[7] with his hand or arm. (Pope Dep. at 29–30.) Blake contends that he did not actually strike Ms. Crotts or even touch her, but merely put out his arm to block her from taking the baby out of the van. However, even though Blake contends that she was only pretending, Ms. Crotts did scream and fall down. (B. Tucker Dep. at 30–31, 38–39.) Furthermore, Blake later pleaded guilty to assaulting Ms. Crotts.[8]

Pope testified that he held up his hands for Blake to stop, but Blake hit him in the chest so Pope grabbed his arms in an attempt to subdue him. (Pope Dep. at 30.) Blake admits that he then began to resist the officers and that they struggled with him for quite some time before taking him to the ground. (B. Tucker Dep. at 32–34, 40–42.) Blake also admits that he hit Pope at one point, although he claims it was accidental. *Id.* at 35–36, 41–42. After finally getting Blake handcuffed, the officers arrested him and placed him in a patrol car. Blake was charged with resisting arrest, simple assault, assault on an officer, and disorderly conduct.

While the officers were struggling with Blake on the ground, Odis approached them from behind. He asserts that he was screaming, trying to tell them not to hit Blake. (O. Tucker Dep. at 27–28). The officers perceived his behavior as a threat, as he was coming toward them in a hostile manner with both fists clenched. Odis retreated slightly when ordered back, but then came at them again, so Pope pulled his weapon and ordered him a second time to get back, which he did. (Pope Dep. at 31–35.) Odis also was arrested, handcuffed and placed in the patrol car with Blake. He was charged with resisting arrest, disorderly conduct, and interfering with an officer. Blake and Odis were transported to the Hardin County Jail where they were kept in custody until their initial appearance the next day.

Officer Barker states in his affidavit that, after Blake and Odis were arrested, Lauren continued to scream and be very upset. He states that he placed Lauren in

---

7. Judy Crotts was a friend of Donna's. It is unclear when she arrived on the scene. Pope testified that she was already in the house while he was talking with Lauren and Donna, and was trying to keep them calm. (Pope Dep. at 28.) However, Lauren testified that Ms. Crotts arrived later, after they all went

outside and were getting ready to leave. (L. Tucker Dep. at 22.)

8. Blake also pleaded guilty to assaulting Pope, and to disorderly conduct. (Def.'s Mot. for Summ. Judg., Ex. 8.)

the back of his patrol car in an effort to calm her down, but did not arrest or handcuff her. (Barker Aff. ¶ 18.) Lauren testified, however, that she was arrested and that she was handcuffed. (L. Tucker Dep. at 24–25.) At approximately 7:29 p.m. Barker drove Lauren less than a mile to the Hardin County Jail, but she was not charged with any offense. Barker states that the purpose of removing her from the scene was to avoid further conflict between Lauren and her mother. (Barker Aff. ¶¶ 18–19.)

Lauren testified that when they got to the Hardin County Jail, she was put in a room like an office where she sat for a while. She states that she asked for an interpreter. (L. Tucker Dep. at 25.) Barker left the Hardin County Jail with Lauren at approximately 7:59 p.m.[9] He first drove Lauren back to her mother's house to pick up her daughter; however, Barker did not leave her there. Instead, Barker drove Lauren and the baby on to her grandmother's house, where he left her at approximately 8:18 p.m. (Barker Aff. ¶¶ 18–21; L. Tucker Dep. at 26–27.)

■ Plaintiffs allege that the City discriminated against them in violation of the ADA by failing to provide an effective means of communication during this incident. However, the City contends that an arrest is simply not a service, program or activity to which the ADA applies. That issue appears to be a fact-specific determination. *See Catlett v. Jefferson County Corr. Dept.*, 2000 U.S. Dist. LEXIS 21662, *17 (W.D.Ky.2000).

It has been held that a deaf plaintiff who was stopped for DUI and alleged that the police made no attempt to effectively communicate with him had no claim under the ADA. *Rosen v. Montgomery County, Md.*,

121 F.3d 154 (4th Cir.1997). In that case, the Fourth Circuit stated:

> [Calling] a drunk driving arrest a "program or activity" of the County, the "essential eligibility requirements" of which (in this case) are weaving in traffic and being intoxicated, strikes us as a stretch of the statutory language and of the underlying legislative intent. *See Gorman v. Bartch*, 925 F.Supp. 653, 655 (W.D.Mo.1996) ("It stretches the statute to talk about the Plaintiff's 'eligibility' to be arrested and taken to jail or to participate in being arrested . . . ."); *cf. Torcasio v. Murray*, 57 F.3d 1340, 1347 (4th Cir.1995) ("The terms 'eligible' and 'participate' imply voluntariness on the part of an applicant who seeks a benefit from the State; they do not bring to mind prisoners who are being held against their will."), *cert. denied*, 516 U.S. 1071, 116 S.Ct. 772, 133 L.Ed.2d 724 (1996).
>
> . . . .
>
> . . . . The police do not have to get an interpreter before they can stop and shackle a fleeing bank robber, and they do not have to do so to stop a suspected drunk driver, conduct a field sobriety test, and make an arrest.

*Id.* at 157–58. Furthermore, in a case where the deaf plaintiff was arrested on domestic violence charges, it was concluded that:

> [F]orestalling all police activity until an interpreter can be located to aid communication with the deaf protagonist would be impractical and could jeopardize the police's ability to act in time to stop a fleeing suspect, physically control the situation, or interview witnesses on the scene. The decisions we ask our officers to make under already stressful, and

---

9. Although Lauren testified that she was at the Hardin County Jail for more than an hour, Barker indicated that, from a review of his radio logs, it appears to have been a little less than thirty minutes. (Barker Aff. ¶ 20.)

sometimes dangerous, circumstances, should not be subjected to second guessing by comparing their in-the-field actions to the requirements of the ADA. *Patrice v. Murphy,* 43 F.Supp.2d 1156, 1160 (W.D.Wash.1999).

Plaintiffs argue that this February 29, 2004 incident is not the type of in-the-field action or on-the-street arrest contemplated by these decisions. They contend that the officers listened to Donna and to Ms. Crotts rather than trying to communicate effectively with Odis, Blake and Lauren. It is claimed that the whole situation arose as a result of the officers' failure to obtain an interpreter and that if the officers had only done so, everything would have been resolved peacefully and Odis, Blake, Lauren and the baby would have been able to go home without any difficulty.

Plaintiffs' theory fails to account for the undisputed evidence that the officers were, in fact, allowing Odis, Lauren, Blake and the baby to leave peacefully. Everyone present on the scene had communicated effectively enough to understand that. However, before getting into the van, Blake hit Judy Crotts, knocking her down.[10] That action was the trigger for everything else that happened that evening. When the officers attempted to arrest Blake for the assault, Blake admitted that he actively resisted for several minutes and that he hit Pope. While struggling with Blake, the officers perceived Odis as threatening them and attempting to interfere with the arrest. Lauren then was so upset with her mother and the officers that she was temporarily removed from the scene. The contention that none of this would have happened if only an interpreter had been present from the beginning is not supported by the record.

The Court concludes that the plaintiffs have failed to produce evidence that they were denied a "service, program or activity" by the City, or if they were, that it because of their disabilities. Therefore, the City's motion for summary judgment (dkt.# 58) is GRANTED. The Clerk is directed to prepare a judgment in accordance with this order and the orders issued on August 2, 2005 and August 10, 2006.

IT IS SO ORDERED.

---

**10.** As stated, *supra,* even though Blake contends that he did not touch Ms. Crotts, he pleaded guilty to assaulting both Ms. Crotts and Officer Pope. In addition, Pope clearly believed that he saw Blake hit Ms. Crotts. (Pope Dep. at 39–40.) Thus, Pope would have reacted in the same way even if Blake had not been speech and hearing disabled.