**Jeannette PATRICE, Plaintiff,**

v.

**Patrick MURPHY, et al., Defendants.**

**No. C97–0068L.**

United States District Court,
W.D. Washington,
at Seattle.

March 25, 1999.

Todd Maybrown, Allen, Hansen & Maybrown, P.S., Scott A.W. Johnson, Alexander Joseph Higgins, Stokes Lawrence, P.S., Seattle, WA, for Jeannette Patrice, plaintiff.

Stewart Andrew Estes, Keating, Bucklin & McCormack PS, Seattle, WA, Thom H. Graafstra, Grant K. Weed, Keithly, Weed & Graafstra, Snohomish, WA, David John Lenci, Snohomish County Prosecuting Attorney, Civil Division, Everett, WA, Tim Walter Dore, Bellevue, WA, for Patrick Murphy, Michael O. Lively, J. Bodmer, N. Preslar, William Harper, J Does, 1–10, City of Snohomish and Snohomish County, defendants.

Kitty–Ann VanDoorninck, Pierce County Prosecuting Attorney's Office, Civil Division, Tacoma, WA, for Pierce County, Interested Party.

ORDER GRANTING CITY DEFENDANTS' RENEWED AND SUPPLEMENTED MOTION FOR SUMMARY JUDGMENT

LASNIK, District Judge.

Jeannette Patrice, a deaf woman, "brought this lawsuit, seeking injunctive, declaratory and other relief under state and federal law, because Snohomish City police officers arrested her, without providing an American Sign Language ("ASL") interpreter, after she had been beaten by her husband." Plaintiff's Memorandum in Opposition at 1.

Plaintiff originally alleged eight causes of action: (1) violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; (2) violation of RCW 2.42.120; (3) violation of the Washington Law Against Discrimination "WLAD", RCW 49.60.030; (4) deprivation of civil rights under 42 U.S.C. § 1983; (5) false arrest; (6) false imprisonment; (7) negligent infliction of emotional distress; and (8) negligent supervision and training of police officers. Defendants seek summary judgment on plaintiff's common law claim of negligent supervision and training and on her claims of ADA, WLAD, and § 1983 violations.[1]

FACTS

Viewing the facts in the light most favorable to plaintiff, it appears that on the morning of January 22, 1994, plaintiff returned from food shopping and placed her groceries in the kitchen. At some point, she placed a kitchen knife in her cookbook to mark her page and began unpacking the groceries. Her then-husband, James Roth (who is also deaf), entered the kitchen and began harassing plaintiff about her purchase of "reduced" beef and the fact that she was going to use the knife to kill him. Plaintiff lost her temper, and when Roth turned his back on her, she struck him on the shoulder with her fist to get his attention. Roth retaliated by twisting and squeezing plaintiff's hands, forcing her to the ground, and punching her in the back.

Hearing plaintiff's screams, her daughter, Katherine, came into the kitchen. Plaintiff, who had been released by Roth, signed that Katherine should call 911. Roth blocked the phone. Plaintiff signed

1. On May 27, 1997, the false arrest and false imprisonment claims were dismissed as barred by the applicable statute of limitations. Plaintiff subsequently waived her claims for emotional distress, emotional pain and suffering, mental anguish, and humiliation, and on December 16, 1998, the state Supreme Court ruled on a certified question that RCW 2.42.120 was invalid. Granting defendants' requested relief, therefore, disposes of this case in its entirety.

that Katherine should go to the neighbors to make the call, which she did.

Defendants Bodmer and Preslar, police officers for the City of Snohomish, arrived at the scene to find plaintiff in the bathroom. Using written notes, Officer Bodmer interviewed Roth in the living room. Although the exact sequence of events is not clear from the evidence presented, at some point an ambulance arrived and plaintiff was seen by a medic, using Katherine as an interpreter. Officer Preslar then requested, through Katherine, that plaintiff return to the kitchen and fill out a "Voluntary Statement and Statement Continuation Form." Although plaintiff did not know what the officer expected of her, she completed the identification section of the form and wrote the following narrative:

> Jim thought I use the knife to kill—it was misunderstand as I use it to hold the page of cooking book. Jim put knife away—I was enough made to hit him— He hits me back—continue fight. He took my hands squeeze—bend fingers all way—His leg hold my head and hit my back. My daughter Katherine was the witness. All this morning was hard—Jim used bad verbal languages on my both daughters—that influence my feelings mixed to carry until now—I blow my temper.—no weapon. just use my fist.[2]

Plaintiff was given privacy and time in which to fill out the form. At her deposition, she confirmed that the narrative was accurate. When the form was completed, Officer Preslar took it into the living room, presumably to show it to Officer Bodmer. Plaintiff assumes, and the officers confirm, that Roth had told Officer Bodmer that plaintiff threatened him with the knife, struck the first blow, and was the primary perpetrator of the domestic violence.

A few minutes later, Katherine ran into the kitchen to tell plaintiff that she had heard the officers say they were going to arrest plaintiff. Officer Preslar returned to the kitchen with a written version of the

*Miranda* warnings and, using gestures, asked plaintiff to read and sign them. Plaintiff asserts that she was very distraught and didn't really pay attention to what she was reading. She did, however, complete the identification section at the top and sign in the three places Officer Preslar had marked with "X"s. Plaintiff was then taken via patrol car to the County jail. (Plaintiff has already settled her claims against the County.)

## DISCUSSION

### I. ADA Claim

42 U.S.C. § 12132 states, "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

Whether an arrest can ever be subject to the provisions of the ADA is contested by the parties. A number of cases suggest that the ADA is inapplicable because an arrest is not the type of service, program, or activity from which a disabled person could be excluded or otherwise denied the benefit. *See Armstrong v. Wilson*, 124 F.3d 1019 (9th Cir.1997) ("We agree with the Seventh Circuit's conclusion that although '[i]ncarceration itself is hardly a 'program' or 'activity' to which a disabled person might wish access, ... there is no doubt that an educational program is a program, and when it is provided by and in a state prison it is a program of a public entity.)'" (citing *Crawford v. Indiana Dept. of Corrections*, 115 F.3d 481, 483 (7th Cir.1997)), *cert. denied*, —— U.S. ——, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998); *Rosen v. Montgomery County Maryland*, 121 F.3d 154, 157 (4th Cir.1997) (where a deaf person was arrested for drunk driving, court held that "calling a drunk driving arrest a 'program or activity' of the

---

**2.** The "mixed to carry" language may not be an accurate reflection of plaintiff's writing.

That particular phrase, however, does not impact the legal analysis that follows.

County, the 'essential eligibility requirements' of which (in this case) are weaving in traffic and being intoxicated, strikes us as a stretch of the statutory language and of the underlying legislative intent.").

There is, however, support in both the legislative history and the case law for the proposition that, at least in some circumstances, an arrest may trigger the protections of the ADA. *See* H.R.Rep. No. 101–485, pt. III, 101st Cong., 2nd Sess. 50, reprinted in 1990 U.S.C.C.A.N. 473 (House Judiciary Committee stated: "In order to comply with the non-discrimination mandate, it is often necessary to provide training to public employees about disability. For example, persons who have epilepsy, and a variety of other disabilities, are frequently inappropriately arrested and jailed because police officers have not received proper training in the recognition of and aid of seizures. Such discriminatory treatment based on disability can be avoided by proper training."); *Lewis v. Truitt,* 960 F.Supp. 175, 178 (S.D.Ind.1997) (ADA claim exists where plaintiff shows that he is disabled, that the arresting officers knew or should have known of the disability, and the officers arrested plaintiff because of legal conduct related to his disability); *Barber v. Guay,* 910 F.Supp. 790 (D.Me.1995) (plaintiff's claim "that he was denied proper police protection and fair treatment [during investigation and arrest] due to his psychological and alcohol problems" states a valid cause of action under the ADA). In certain circumstances, therefore, courts have found that the ADA applies to an arrest situation, although neither the cases cited nor the legislative history explains how an arrest falls within the scope of the statutory language.

The Ninth Circuit has held that a successful plaintiff under the ADA must demonstrate "that he (1) is a handicapped person; (2) that he is otherwise qualified; and that the [defendants'] actions either (3) excluded his participation in or denied him the benefits of a service, program, or activity; or (4) otherwise subjected him to discrimination on the basis of his physical handicap." *Duffy v. Riveland,* 98 F.3d 447, 455 (9th Cir.1996). There are two distinct types of injury set forth in the statute, either one of which will give rise to a claim under the ADA if they arise from the fact that the plaintiff is disabled. First, a disabled person could be "excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." Second, the potential plaintiff could be "subjected to discrimination by any such entity." [3]

Recognition of the either/or nature of § 12132 may explain the opposite conclusions reached in the above-cited cases. Where plaintiffs have argued that an arrest was a type of service, program or activity from which he has been excluded or denied the benefits, the courts have found that there is no ADA claim. As noted in *Rosen,* 121 F.3d at 157, casting the perpetration of a crime and any resulting arrest as a service or activity the benefit of which a disabled person has been denied strains the statutory language to, if not past, the breaking point.[4]

Where a plaintiff alleges that he was arrested because of his disability (and not because of the perpetration of some crime unrelated to his disability), the "subjected to discrimination" prong of § 12132 comes into play and both the legislative history and the few cases on point suggest that an ADA claim should lie. For example, in *Lewis,* 960 F.Supp. 175, the plaintiff was deaf. When the police came onto his property to remove his granddaughter in a child custody dispute, Mr. Lewis apparent-

---

**3.** The Court notes that the voluntariness of a disabled person's participation is not relevant to this analysis. *See Armstrong,* 124 F.3d at 1024. *Contra Torcasio v. Murray,* 57 F.3d 1340, 1347 (4th Cir.1995), *cert. denied,* 516 U.S. 1071, 116 S.Ct. 772, 133 L.Ed.2d 724 (1996).

**4.** Contrary to plaintiff's suggestion, this part of the *Rosen* analysis has not been discredited by or distinguished from any relevant Ninth Circuit or United States Supreme Court holdings.

ly failed to carry out instructions to the officers' satisfaction. The officers, who didn't believe that Mr. Lewis was deaf (despite being so informed by others in the house), thought he was being difficult and non-compliant, beat him, and arrested him. Mr. Lewis would not have come to the police's attention or been arrested had he been able to hear. In such contexts, a finding that Mr. Lewis was discriminated against because of his deafness, and the application of the ADA, was justified.

There are also numerous policy reasons why the ADA should apply to the context of an arrest only where the arrestee was subjected to discrimination because of his disability (*i.e.*, where plaintiff was arrested because his disability caused behavior that the police mistakenly confused with illegal activity). Where underlying criminal activity has occurred, such as a bank robbery, drunken driving, or domestic violence, and the officers are engaged in an on-the-street response, investigation, and arrest, forestalling all police activity until an interpreter can be located to aid communication with the deaf protagonist would be impractical and could jeopardize the police's ability to act in time to stop a fleeing suspect, physically control the situation, or interview witnesses on the scene. The decisions we ask our officers to make under already stressful, and sometimes dangerous, circumstances should not be subjected to second guessing by comparing their in-the-field actions to the requirements of the ADA.[5]

The Court by no means intends to imply that the stresses of police activity justify the trampling of constitutional or clearly applicable statutory rights. The statutory interpretation for which plaintiff is arguing, however, is not apparent from the face of the statute itself, and the policy implications of the proffered interpretation

should, in such circumstances, be considered when determining its reasonableness. In addition, there are other, already established avenues through which an arrestee's rights are protected in the criminal justice system. Had, for example, plaintiff been unable to communicate with the investigating officers, they may have been unable to acquire sufficient information to make a probable cause determination. If that were the case, the lack of probable cause would require the invalidation of plaintiff's arrest as violative of the Fourth Amendment. *See, e.g., United States v. Delgadillo–Velasquez,* 856 F.2d 1292 (9th Cir.1988). Similarly, had plaintiff been unable to comprehend the *Miranda* warnings she was given, suppression of her statement may have been appropriate. *See, e.g., Medeiros v. Shimoda,* 889 F.2d 819, 824 (9th Cir. 1989), *cert. denied,* 496 U.S. 938, 110 S.Ct. 3219, 110 L.Ed.2d 666 (1990). None of these existing protections are implicated in this case, however, leaving plaintiff to argue that the ADA grants additional rights to arrestees. The Court declines to adopt that theory.

■■■ The Court finds that an arrest is not the type of service, program, or activity from which a disabled person could be excluded or denied the benefits, although an ADA claim may exist where the claimant asserts that he has been arrested because of his disability (*i.e.*, he has been subjected to discrimination). In the case at hand, plaintiff's counsel expressly denied that plaintiff was asserting discrimination or disparate treatment. Rather, plaintiff's claim is that defendants failed to make reasonable accommodation to allow plaintiff to enjoy the benefits of police services. Plaintiff's claim fails to state a viable cause of action under § 12132 of the ADA.

---

5. The application of the ADA to other forms of law enforcement activities, such as prison administration, is not inconsistent with this analysis. The programs, services, and activities provided to inmates in prison have been considered, planned, and instituted over time, allowing the prison systems to ensure that their actions satisfy the requirements of the ADA. In contrast, the police officer responding to a 911 call or witnessing a crime has very little time in which to think or plan the best way to apprehend, subdue, and question the participants.

Even if the Court were to assume that plaintiff's assertions fall within the scope of the ADA, plaintiff's claim fails for two reasons. First, plaintiff was arrested because probable cause existed, as discussed more fully below, not because she is disabled. Absent a causal link between plaintiff's disability and the injury of which she complains (her arrest), there can be no claim under § 12132.[6]

Second, the officers, through the use of written materials, provided all the accommodation required under the ADA. Plaintiff asserts that the only way to acceptably accommodate a deaf person is to obtain the services of a qualified interpreter. This is, at best, a very narrow view of a deaf person's abilities: there are many deaf people who can communicate with the hearing world through other means, such as lip reading, the use of various hearing devices, speech, and written English. Where plaintiff is able to communicate with the officers using printed forms and her written statements, with no apparent difficulty or loss of meaning (as was the case here), no additional accommodation is required.[7]

In an unpublished case relied upon by plaintiff, *Brown v. King County Dept. of Adult Corrections*, 1998 U.S. Dist. LEXIS 20152 (W.D.Wash., December 9, 1998) (M.J. Weinberg, acting on referral with consent of the parties), the plaintiff was a deaf prisoner who objected to being handcuffed during transit on the grounds that it prevented him from communicating with the guards. The court held that no accommodation was necessary under the ADA where the prisoner was capable of oral communication and could therefore communicate requests or questions to the guards while handcuffed. Under this analysis, plaintiff's specific abilities are taken into consideration to determine what accommodation is required. In our case, where plaintiff reads and writes well, accommodation via the use of the written word is, as a matter of law, sufficient.

## II. WLAD Claim

Washington's Law Against Discrimination provides, in pertinent part:

(1) The right to be free from discrimination because of race, creed, color, national origin, sex, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a disabled person is recognized as and declared to be a civil right. This right shall include, but not be limited to:

. . .

(b) The right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement; . . .

RCW 49.60.030. At oral argument, plaintiff's counsel argued that the provision of police services in plaintiff's house made the residence a "place of public . . . accommodation . . . ."

The only case cited by either party on this issue is *Fell v. Spokane Transit Auth.*,

---

**6.** At oral argument, plaintiff's counsel argued that even if the presence of an ASL interpreter made no difference to the ultimate outcome of the officers' investigation, that fact would only affect the damage calculation and would not warrant dismissal of plaintiff's claim for injunctive relief under the ADA. The link between plaintiff's disability and her injury, however, is an element of the claim under § 12132, which applies only to those harms that arise "by reason of such disability." Absent the requisite causal connection, there is no claim under § 12132.

**7.** Taking the facts in the light most favorable to plaintiff, there is no indication that the defendant officers knew or should have known that plaintiff was having trouble understanding the situation, could not comprehend the written forms, or was unable to adequately provide her narrative. Had plaintiff been having any such difficulties, her command of written English and her access to her hearing daughter were such that she could have so informed the officers. She did not, and should not now be heard to argue that defendants should have taken steps that they had no reason to know were needed or even preferred by the plaintiff.

128 Wash.2d 618, 911 P.2d 1319 (1996), where the court determined that there was a genuine issue of material fact whether a disabled person's home was a "place" that had to be served by paratransit services. In that case, however, the parties agreed that public transportation was a "public accommodation," which is the issue here.

■ In the absence of any meaningful authority, the language of the statute guides the Court. The Court finds that the WLAD was not intended to equate "place of public accommodation" with a private person's home. First, whatever accommodations or facilities are offered by such a residence are peculiarly private, not public, removing them from the scope of the statute. Second, if the statute is interpreted as plaintiff wants it to be, the legislature would have, with one fell swoop, outlawed private discrimination, a step that not even the federal government has yet undertaken.

The use of the word "public" was clearly meant to outlaw discrimination by those who make money serving the masses. The statute does not intrude into the purely private sphere. Since plaintiff's house cannot be considered a place of public accommodation, RCW 49.60.030(1)(b) does not apply.

### III. § 1983 Claim

Plaintiff alleges that defendants infringed her civil rights by violating her Fourth and Fifth Amendment rights and her rights under the ADA and the WLAD. This claim is legally insufficient for a number of reason, including, but not limited to, the following.

### A. Fourth Amendment

■ Plaintiff asserts that her arrest was an unreasonable seizure under the Fourth Amendment because the officers lacked probable cause. The arresting officers made the determination that probable cause existed to arrest plaintiff for the crime of domestic violence based on the information they had obtained from the two protagonists, both of whom said (1)

Roth thought plaintiff was going to use the knife to kill him and (2) plaintiff was the initial aggressor. See RCW 10.31.100(2)(b) (officers are required to arrest person involved in domestic dispute who has caused physical pain or threatened serious bodily injury to a family member and whom "the officer believes to be the primary physical aggressor"). The Court finds, as a matter of law, that probable cause existed for plaintiff's arrest.

Plaintiff argues that, with the help of an ASL interpreter, she could have talked her way out of the seemingly damning evidence and avoided arrest. Her claim appears to be that had an interpreter been present, the officers may have asked her to elaborate on her statement, she would have explained that Roth's belief that she was threatening him with a knife was bogus and that she was just trying to get Roth's attention when she hit him, and the officers would have chosen to arrest Roth instead of her.

The fact that the officers may not have exhaustively investigated the incident does not warrant a finding that there was no probable cause, however. See, e.g., United States v. Valencia, 24 F.3d 1106, 1108 (9th Cir.1994) (probable cause exists where "the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe a suspect has committed, is committing, or is about to commit a crime."). Contrary to counsel's assertions that plaintiff was arrested without any attempt to obtain her version of the facts, plaintiff was given the opportunity to and did communicate her story to the officers, who then made a probable cause determination and arrest based on the information provided by all of the involved parties. Plaintiff's account was legible, comprehensible, and, at least in relevant part, supported Roth's assertions that plaintiff utilized a knife and was the initial aggressor. The fact that the officers did not ask any follow-up questions before making their determination does not make their investigation inadequate on the con-

 

stitutional level where they had already obtained information from plaintiff which, on its face, established and/or confirmed the existence of probable cause.

Thus, there was no violation of the Fourth Amendment.

### B. Fifth Amendment

■ Plaintiff argues that "the officer's failure to adequately communicate Ms. Patrice's constitutional rights to remain silent and her right to counsel is actionable under § 1983." Plaintiff's Memorandum in Opposition at 19. Even under plaintiff's version of the facts, however, her rights were presented to her in a form (written) which she was capable of comprehending. The fact that she may not have read the warnings as carefully as she now thinks she should have was the result of her involvement in a domestic violence dispute, not the inadequacy of the written warnings or her inability to comprehend.

■ Plaintiff may also be arguing that she was interrogated prior to being given her *Miranda* warnings, such that her completion of the Voluntary Statement constitutes a deprivation of her Fifth Amendment rights. It is not at all clear that the failure to provide *Miranda* warnings is, in and of itself, a Fifth Amendment violation. That point aside, plaintiff was not subjected to the type of custodial interrogation that would have triggered the need to provide the *Miranda* warnings. According to plaintiff, she was in her own home when she filled out the Voluntary Statement and she was under the impression that (1) the officers were there to protect her from further injury from Roth, (2) her own liberty was not restricted (she was free to move about the house and was left on her own at various times), and (3) it was Roth that was going to be arrested. Plaintiff was, in fact, shocked when Katherine told her the officers were planning to arrest her. The type of police-dominated, coercive atmosphere that made the courts concerned about the voluntariness of certain statements was totally absent in this case. In such circumstances, the *Miranda*

warnings were not required prior to the officer's questioning of plaintiff.

There was, therefore, no violation of the Fifth Amendment.

### C. ADA and WLAD

As discussed above, there was no violation of either the ADA or the WLAD that could support plaintiff's claims under those statutes. Thus, even if the Court assumes for purposes of this motion that violations of those statutes could support a claim under § 1983, no such violations have been shown and plaintiff's § 1983 claim must fall.

## IV. Conclusion

Defendants' motion for summary judgment is GRANTED in its entirety.