# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| A.S., an individual,<br><br>Respondent,<br><br>v.<br><br>PROVAIL, a nonprofit corporation; JANE and JOHN DOES 1-5, individuals,<br><br>Petitioners. | No. 86730-0-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

BIRK, J. — A.S. is a vulnerable adult who received supported living services from PROVAIL, a nonprofit corporation. The superior court granted A.S. partial summary judgment that PROVAIL is liable under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, because PROVAIL's employee sexually assaulted her. We hold that PROVAIL is subject to the WLAD in providing its services to the public and does not avoid WLAD liability on the ground that it provided its services to A.S. in her private room and so, it claims, not in a place of public accommodation. We further reject PROVAIL's arguments that genuine issues of material fact exist over whether the sexual assault occurred or whether A.S. consented to sexual contact. We affirm.

I

A

PROVAIL is a nonprofit, registered tax exempt, 26 U.S.C. § 501(c)(3) charitable organization. PROVAIL describes itself as providing "supported living services that can be provided in single-family homes shared by three to four residents with developmental disabilities." The residents are eligible for PROVAIL's services because "they have a specific level of need as determined by the Developmental Disabilities Administration [DDA] of [the Department of Social and Health Services]." There is no direct payment between the resident and PROVAIL, and "[t]he only contract that exists is between the DDA and PROVAIL." The contract states that "the Contractor shall comply with all applicable federal, state, and local laws and regulations, including but not limited to, nondiscrimination laws and regulations."

PROVAIL purchased a residential dwelling in the 1990's (House 1) and then sold it to Parkview Services in the early 2000s. PROVAIL owned 14 other homes it also sold to Parkview and continues to be the only supported living provider in those homes, including House 1.

Residents at House 1 lease their home from Parkview. When a vacancy opens in House 1, Parkview invoices PROVAIL and PROVAIL issues a rent payment to Parkview from the DDA. To fill a vacancy, the DDA generates a referral and PROVAIL begins the mutual acceptance process wherein PROVAIL ascertains whether a potential tenant wants to live in House 1. When a tenant

meets the requirements of House 1, and the tenant wants to be placed in the home, PROVAIL maintains authority whether to ultimately place the tenant.

PROVAIL has provided supportive living services to residents at House 1 since 1995. It provides services on-site for 24 hours a day, 7 days a week. It assists with daily living activities, "including but not limited to bathing, changing, toileting, meal preparation, transportation and getting out into the community for recreation of the clients' choosing." PROVAIL is also responsible for the day-to-day cleaning, and clients may ask for extra services, such as additional cleaning, and PROVAIL will provide those services as well. In sum, PROVAIL provides services based on its responsibilities at House 1 plus requests from individual residents.

PROVAIL maintains an office space in House 1, which is subject to resident approval. The office contains some cleaning supplies—personal client supplies and supplies PROVAIL uses to provide its services. Some of PROVAIL's other property in the office includes a computer, a printer, a file cabinet, a staff noticeboard with information for PROVAIL's employees, and a staff contact list. The office also contains a shelf with PROVAIL-specific manuals such as a procedure manual.

B

A.S. was born with spastic quadriplegic cerebral palsy and in 2017 began leasing a room in House 1 from Parkview. She obtained supported living services from PROVAIL in 2017 at the same address. At the time of the incident in 2021, A.S. was receiving 24-hour supported living services.

On September 18, 2021, Shoreline Police Officer Paul Thompson responded to a report that a sexual assault occurred at A.S.'s residence. A.S. had texted her sister, D.T., stating a staff member "just had sex with me." D.T. called the police. Sometime before the police arrived at A.S.'s residence, PROVAIL became aware of the incident. According to Thompson's report, A.S. stated that PROVAIL direct support staff employee Jefferson Lansana forcefully grabbed her breasts, inserted his fingers into her vagina, inserted his penis into her vagina, and inserted his penis into her mouth.

After being interviewed by the responding officer, A.S. proceeded to Harborview Medical Center where she completed a sexual assault response team examination. A DNA examination conducted by Washington State Patrol indicated human saliva on A.S.'s vagina and left and right breasts. A DNA report conducted by PROVAIL's expert, Dr. Monte Miller, reported that foreign male DNA consistent with Jefferson Lansana's was found on A.S.'s vagina. His report also indicated that there was not a significant amount of male DNA in A.S.'s vagina.

On August 11, 2022, A.S. filed a complaint against PROVAIL for sexual abuse of a vulnerable adult as committed by Lansana, sex and disability discrimination under the WLAD, negligence, and other claims. On December 9, 2022, the State charged Lansana with rape in the second degree under RCW 9A.44.050(1)(d).[1]

---

[1] A.S. has moved this court to allow further evidence that after the trial court made the summary judgment rulings under review, Lansana pleaded guilty to one count of indecent liberties (healthcare provider), contrary to RCW 9A.44.100(1)(d), as charged in a first amended information. Under RAP 9.12, on review of an order granting or denying a motion for summary judgment the appellate court will

On February 16, 2024, A.S. filed a motion for partial summary judgment to establish strict liability under the WLAD, arguing "PROVAIL is a place of public accommodation as a matter of law because it meets the criteria listed in the definition and does not fall within any exceptions." A.S. also argued that any consent is not a defense to sex discrimination in this case. In its own motion for partial summary judgment on A.S.'s WLAD claim, PROVAIL argued that A.S.'s residence in House 1 is private, and not a place of public accommodation subject to the WLAD. PROVAIL also argued the WLAD is inapplicable because PROVAIL provides only services.

The superior court granted A.S.'s summary judgment motion and denied PROVAIL's motion for summary judgment, ruling that PROVAIL was a place of public accommodation.[2] The court also ruled that A.S. is a vulnerable adult who was in a significant relationship with Lansana as a caretaker, and thus, PROVAIL could not assert a consent defense. PROVAIL unsuccessfully moved for reconsideration. This court granted PROVAIL's motion for discretionary review.

---

consider only evidence and issues called to the attention of the trial court. And under RAP 9.11, there is no inequity in refusing the extraordinary relief of new evidence on review where this matter is before us on interlocutory review of a partial summary judgment on liability concerning one of several claims, and the case will be remanded for further proceedings. For both reasons, A.S.'s motion to allow further evidence is denied.

[2] The superior court analyzed whether PROVAIL met the proviso to be excluded from the definition of a place of public accommodation as a "distinctly private" organization under RCW 49.60.040(2) and the seven-factor test in Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles, 148 Wn.2d 224, 250, 59 P.3d 655 (2002). In this court, the parties focus on whether PROVAIL meets the definition of a place of public accommodation. PROVAIL does not challenge before us the superior court's ruling that, assuming it meets the definition, it would not then be exempted under the proviso.

5

II

A

PROVAIL first argues that the superior court erred in applying the WLAD to PROVAIL's provision of services to A.S., on the ground that PROVAIL provided services in A.S.'s private residence and therefore not in a place of public accommodation. To establish a prima facie case of discrimination pursuant to RCW 49.60.215,

> a plaintiff must prove that (1) the plaintiff is a member of a protected class, (2) the defendant's establishment is a place of public accommodation, (3) the defendant discriminated against the plaintiff when it did not treat the plaintiff in a manner comparable to the treatment it provides to persons outside that class, and (4) the plaintiff's protected status was a substantial factor that caused the discrimination.

Floeting v. Grp. Health Coop., 192 Wn.2d 848, 853-54, 434 P.3d 39 (2019). Regarding sex discrimination, "[o]ther forms of intentional sexual discrimination, including physical abuse and assault, also constitute sex discrimination." W.H. v. Olympia Sch. Dist., 195 Wn.2d 779, 792, 465 P.3d 322 (2020).

PROVAIL argues that "the WLAD applies to *places* and not to *services*." Continuing that "a person's private home is not a place of public accommodation," and that PROVAIL "provides *services*" to A.S. "*in* [A.S.'s] *own home*." PROVAIL maintains that the superior court erred in granting A.S. summary judgment on liability under the WLAD. We disagree.

We review summary judgment de novo. Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). "[W]e engage in the same inquiry as the trial court." Haley v. Amazon.com Servs., LLC, 25 Wn. App. 2d 207, 216, 522

6

P.3d 80 (2022).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  CR 56(c); see also Ranger, 164 Wn.2d at 552.  "A 'material fact' is a fact upon which the outcome of the litigation depends, in whole or in part."  Haley, 25 Wn. App. 2d at 216 (quoting Morris v. McNicol, 83 Wn.2d 491, 494, 519 P.2d 7 (1974)).  On a question of fact, the court must consider the facts in the light most favorable to the nonmoving party, and summary judgment is appropriate only if reasonable persons could reach but one conclusion.  Marincovich v. Tarabochia, 114 Wn.2d 271, 274, 787 P.2d 562 (1990).  Here, we conclude the court did not err in denying PROVAIL's motion for summary judgment—and in granting A.S.'s motion for summary judgment—by applying the WLAD to PROVAIL's provision of services that it makes available to the public.[3]

1

For purposes of the WLAD, the scope of covered public accommodations is not limited to fixed locations, but "has expanded from fixed locations to mobile sites to business facilities of any kind whose goods and privileges are made available to the public."  Fraternal Ord. of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Ord. of Eagles, 148 Wn.2d 224, 250, 59 P.3d 655 (2002) (citing

---

[3] PROVAIL also appeals the superior court's denial of its motion for reconsideration.  Because we hold the superior court did not err in granting A.S.'s motion for summary judgment, we similarly conclude that the superior court did not err in denying reconsideration.

7

United States Jaycees v. McClure, 305 N.W.2d 764, 767 (Minn. 1981)).[4]  In Fraternal Order of Eagles, two Washington chapters of an international fraternal organization challenged the organization's "male-only membership policy" under the WLAD.  Id. at 228-29.  The court's opinion reflects that some of the organization's and the local chapters' activities included the use of physical facilities, including holding meetings and conventions, use of a club or social room, renting facilities to the public, and hosting dinners, celebrations, and civic events.  Id. at 230-31.  However, in concluding that the WLAD applied, the court did not rely on any of these locations qualifying as a public accommodation, but rather held that "the WLAD reaches the *membership policies* of organizations." Id. at 250 (emphasis added).  Instead of relying on any specified site, social room, or facility, the court held the relevant public accommodation was the organization's policy, because of the manner in which the policy interacted with the public.  This followed from "[e]xamining the business character of an organization" as one factor in determining whether a public accommodation statute applies.  Id. at 248-49. Under Washington law as explained in Fraternal Order of Eagles, we hold that a business may not discriminate in violation of the WLAD in the provision of its services that it makes available to the public.

In extending the WLAD to reach a business's provision of services made available to the public, the Washington Supreme Court interpreted the WLAD to

---

[4] At the time of the decision in Fraternal Order of Eagles, the definition of public accommodation was codified as former RCW 49.60.040(10) (1997).  The definition has been re-codified as RCW 49.60.040(2), but is unchanged.  LAWS OF 2018, ch. 176, § 2(2).

have a reach similar to other states' antidiscrimination laws that extend beyond fixed locations, specifically Minnesota's Human Rights Act[5] and California's Unruh Act.[6]  Id. at 249.  The court cited with approval Rotary Club of Duarte v. Board of Directors of Rotary International, 178 Cal. App. 3d 1035, 1043, 224 Cal. Rptr. 213 (1986), aff'd sub nom. Board of Directors of Rotary International v. Rotary Club of Duarte, 481 U.S. 537, 107 S. Ct. 1940, 95 L. Ed. 2d 474 (1987), as supportive of the reach of the WLAD.[7]  Fraternal Ord. of Eagles, 148 Wn.2d at 249.  In Rotary

---

[5] "In [former Minnesota Statute] § 363.01(18) (1980) the legislature expressed its own special and unusually broad definition of the term 'place of public accommodation': 'a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public.' " U.S. Jaycees v. McClure, 305 N.W.2d 764, 766 (Minn. 1981).  The statute is now recodified at Minn. Stat. § 363A.03 Subd. 34.

Washington's explicit citation of Minnesota law as indicative of the scope of the WLAD distinguishes another case on which PROVAIL relies, Clarke v. Olsten Certified Healthcare Corp., 1998 ME 180, 714 A.2d 823 (1998).  Clarke limited a municipal antidiscrimination law to non-exclusive, specific, listed physical places of public accommodation.  Id. at 824-25 & n.2.  Clarke explained that such laws are distinguishable from laws like Minnesota's, which are not limited to physical places but sweep more broadly.  Id. at 825.  In Fraternal Order of Eagles, by contrast, the Washington Supreme Court aligned the WLAD with the very, broadly-sweeping Minnesota law that Clarke distinguished.  148 Wn.2d at 249.  Thus, Clarke's analysis is inconsistent with Washington law.

[6] "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b).

[7] Because the Washington Supreme Court looked to these statutes to determine the scope of the WLAD, it is immaterial to our analysis that there may be differences in the wording of the statutes.  We are bound by the Supreme Court's decision, 1000 Va. Ltd P'ship v. Vertecs Corp., 158 Wn.2d 566, 578, 146 P.3d 423 (2006), and the lack of legislative response following the Supreme Court's interpretation of the WLAD, now 23 years ago, is indicative of legislative

Club of Duarte, the court applied California's Unruh Act, Cal. Civ. Code § 51(b), to the male-only membership policy of the Board of Directors of Rotary International, holding that because "membership in an organization constituting a business establishment is clearly an 'advantage' or 'privilege' under the Unruh Act, exclusion from or termination of membership arbitrarily on the basis of sex is prohibited." 178 Cal. App. 3d at 1059. California courts have consistently applied the Unruh Act to prohibit discrimination in a business's provision of its services to the public.[8]

This interpretation of the WLAD is supported by its describing the right to be "free from discrimination" as one of "full enjoyment" of publicly available services. RCW 49.60.030(1)(b). As noted in Fraternal Order of Eagles, "[t]he Legislature in 1889 enacted the State's first antidiscrimination law, a civil rights act, which granted to all persons 'full and equal enjoyment of the public accommodations . . . applicable alike to all citizens of whatever race, color or

---

acquiescence in that decision, Antio, LLC v. Dep't of Revenue, 3 Wn.3d 882, 891, 557 P.3d 672 (2024).

[8] See White v. Square, Inc., 7 Cal. 5th 1019, 1032, 446 P.3d 276, 250 Cal. Rptr. 3d 770 (2019) (accessing online services: "[A]n individual bringing an Unruh Civil Rights Act claim against an online business must allege, for purposes of standing, that he or she visited the business's website, encountered discriminatory terms, and intended to make use of the business's services."); Burks v. Poppy Constr. Co., 57 Cal. 2d 463, 468-69, 370 P.2d 313, 20 Cal. Rptr. 609 (1962) (sales of real estate: "The word 'establishment,' as broadly defined, includes not only a fixed location, such as the 'place where one is permanently fixed for residence or business,' but also a permanent 'commercial force or organization' or 'a permanent settled position (as in life or business).' " (quoting WEBSTER'S NEW INTERNATIONAL DICTIONARY 874 (2d ed. 1957); WEBSTER'S NEW INTERNATIONAL DICTIONARY 778 (3d Ed. 1961)); Smith v. BP Lubricants USA Inc., 64 Cal. App. 5th 138, 153, 278 Cal. Rptr. 3d 587 (2021) (product presentation: "The Unruh Civil Rights Act protects all recipients of a business establishment's services wherever provided."); Alch v. Super. Ct. of Los Angeles County, 122 Cal. App. 4th 339, 391, 19 Cal. Rptr. 3d 29 (2004) (talent agency services).

nationality.' " 148 Wn.2d at 243 (second alteration in original) (quoting Powell v. Utz, 87 F. Supp. 811, 815 (E.D. Wash. 1949)). The WLAD grants to those it protects "the right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement." RCW 49.60.030(1)(b). Full enjoyment "includes the right to purchase any service . . . offered or sold on, or by, any establishment to the public . . . without acts directly or indirectly causing persons . . . with any sensory, mental, or physical disability . . . to be treated as not welcome." RCW 40.60.040(14). This language supports A.S.'s right under the WLAD to the full and equal enjoyment of PROVAIL's services available to the public, regardless of the physical place in which some or all of those services are provided.

To argue case law has restricted the WLAD to only places and not services, PROVAIL cites Fell v. Spokane Transit Authority, 128 Wn.2d 618, 911 P.2d 1319 (1996). PROVAIL points to Fell's statement that the definition of place of public accommodation in the WLAD "makes it very clear that the reach of the statute extends to places and facilities, *not services*." Id. at 638. In Fell, plaintiffs with disabilities challenged a new Spokane paratransit service model that no longer provided paratransit services for residences outside a three-quarters mile area around fixed transit routes. 128 Wn.2d at 623-24. The parties stipulated that the transit service was a public accommodation, and the plaintiffs argued that the transit authority was required to provide paratransit service within the entire geographic area of its service as the "place" of public accommodation. Id. at 638. Relying on the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C.§§ 12101-

11

12213, and the WLAD, the court declined to accept this definition, instead holding that "place of public accommodation" meant the bus stop or transit centers where the accessibility service is provided. Fell, 128 Wn.2d at 638. The court reasoned that, otherwise, "the service area for a unit of government would now become the entire jurisdictional or geographic boundary of the governmental unit." Id.

When Fell said the WLAD applied to places and facilities, not services, it was in holding in that case that the transit facilities were the public accommodation, not the transit service itself. The holding of Fell in fact accords with the rule that a business may not discriminate in violation of the WLAD in the provision of its services that it makes available to the public. Thus, we do not interpret Fell as holding, as PROVAIL reasons, that a business may invidiously discriminate in providing services otherwise generally available to the public if it provides those services in the recipient's private home. And, our holding that PROVAIL may not do so is consistent with Fell's application of the WLAD in its specific context involving alleged disability discrimination in public transit services. Fraternal Order of Eagles clarified that the WLAD reaches a business's provision of services to the public.[9]

---

[9] For the same reason, Patrice v. Murphy, 43 F. Supp. 2d 1156 (W.D. Wash. 1999) does not follow an analysis of the WLAD that can be sustained after Fraternal Order of Eagles. Patrice rejected a WLAD claim based on a police response to a private residence, relying on the fact the private residence was not a public facility. Id. at 1162. We do not comment on the applicability of the WLAD to the facts present in Patrice other than to observe that the analysis the court employed would not be dispositive under the Supreme Court's more recent clarification of the WLAD.

PROVAIL serves members of the public who qualify for DDA benefits. From those who qualify and are referred, PROVAIL may decline services only if there is a legitimate or rational basis it cannot provide services. PROVAIL concedes it provides services to the disabled public of Washington. It also concedes it cannot discriminate against those who qualify based on "ethnicity or race or language group or gender or anything else." DSHS requires community residential service providers to agree to follow all applicable nondiscrimination laws. The public accommodations provisions of the WLAD reach PROVAIL's provision of its services to the public, and it may not discriminate against the recipients of its services in violation of the WLAD.

2

Although PROVAIL's argument misconstrues the scope of the WLAD, we would reject its argument in this case even if the analysis depended on locating the specific facility of A.S.'s room in House 1 among the places of public accommodation expressly covered by the WLAD. A place of public accommodation, among other places, "includes, but is not limited to, any place . . . kept for gain, hire, or reward," any place "where charges are made for admission, service, occupancy, or use of any property or facilities . . . for the rendering of personal services," or any place "where medical service or care is made available." RCW 49.60.040(2). Especially considering the statutory list of places of public accommodation is not exclusive, A.S.'s residence at her room within House 1 adequately meets this definition when A.S. received PROVAIL's services.

PROVAIL at one time purchased House 1. When a vacancy opens, PROVAIL issues rent payments to the current landlord, effectively controlling the unit, and maintains authority whether to place a tenant in House 1. PROVAIL maintains office space in House 1. These circumstances together supported PROVAIL providing its services to tenants in House 1 as part of its business. For purposes of the WLAD, House 1 was "kept" by PROVAIL "for gain," was a place where "charges are made for . . . service . . . for the rendering of personal services," and was a place "where medical service or care is made available."

In arguing to the contrary, PROVAIL focuses on A.S.'s right, as a residential tenant, to exclusive possession of her own room, stressing A.S.'s decision to move in, her changing the carpeting and painting (with the landlord's permission), and her rights to self-direct the services she receives, to refuse service, and to manage her own room as any other residential tenant. PROVAIL argues there is "[a]t the very least" a "disputed question of fact" about whether A.S.'s room or House 1 should be viewed as a place of public accommodation. See Fell, 128 Wn.2d at 639 ("The question of what constitutes [Spokane Transit Authority's] 'place of public accommodation' is appropriately a question of fact for the trier of fact."). While we accept that A.S. enjoyed exclusive possession of her room within House 1 with all the same rights as any other residential tenant, and that her room was not open to the public, we do not agree that this is material in determining whether A.S. was entitled to the protection of the WLAD in receiving PROVAIL's publicly offered services free from discrimination. That A.S. held a residential lease over her room does not change that House 1 was originally established and then

maintained by PROVAIL in support of its providing services to those who become eligible to live there. Viewing the facts in the light most favorable to PROVAIL, no reasonable juror could reach any conclusion other than that A.S. benefitted from a public accommodation subject to the WLAD.

B

PROVAIL argues that the superior court erred in granting summary judgment on PROVAIL's liability under the WLAD for two more reasons. PROVAIL argues that (1) there is a genuine issue of material fact as to whether Lansana assaulted A.S. and therefore whether a discriminatory act occurred, and (2) evidence supported a defense of consent. We address each argument in turn.[10]

1

PROVAIL argues that inconsistencies in A.S.'s reporting, Officer Thompson's narrative summary in the Shoreline police report, and Dr. Miller's DNA report create genuine issues of material fact about whether sexual contact occurred. We disagree.

"When, at the hearing on a motion for summary judgment, there is contradictory evidence, or the movant's evidence is impeached, an issue of credibility is present, provided the contradicting or impeaching evidence is not too incredible to be believed by reasonable minds. The court should not at such hearing resolve a genuine issue of credibility, and if such an issue is present the

---

[10] In its opening brief, PROVAIL also asserts that the superior court erred in ruling that the causation element of A.S.'s WLAD claim was met. However, PROVAIL did not present this issue in its motion for discretionary review, and as a result, has not shown that this issue merits interlocutory review under RAP 2.3(b). We therefore decline to review the issue.

motion should be denied." Balise v. Underwood, 62 Wn.2d 195, 200, 381 P.2d 966 (1963)). A reviewing court " 'may not weigh the evidence, assess credibility, consider the likelihood that the evidence will prove true, or otherwise resolve issues of material fact.' " TracFone, Inc. v. City of Renton, 30 Wn. App. 2d 870, 876, 547 P.3d 902 (quoting Haley v. Amazon.com Servs., LLC, 25 Wn. App. 2d 207, 217, 552 P.3d 80 (2022)), review denied, 3 Wn.3d 1030, 559 P.3d 494 (2024). " 'The moving party bears the burden of showing that there is no genuine issue of material fact.' " Blue Ribbons Farms Prop. Owners' Ass'n v. Mason, 31 Wn. App. 2d 1, 15, 547 P.3d 927 (2024) (quoting Walston v. Boeing Co., 181 Wn.2d 391, 395-96, 334 P.3d 519 (2014)). " 'If this burden is satisfied, the nonmoving party must present evidence demonstrating material fact.' " Id. (quoting Walston, 181 Wn.2d at 395-96). A summary judgment opponent " 'must do more than simply show that there is some metaphysical doubt as to the material facts.' " Gingrich v. Unigard Sec. Ins. Co, 57 Wn. App. 424, 430, 788 P.2d 1096 (1990) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). We view all facts and reasonable inferences in the light most favorable to the nonmoving party. Elcon Constr., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 164, 273 P.3d 965 (2012).

"A 'material fact' is one upon which the outcome of the litigation depends." Jacobsen v. State, 89 Wn.2d 104,108, 569 P.2d 1152 (1977). " 'RCW 49.60.215 imposes strict liability on employers for the actions of their employees.' " W.H., 195 Wn.2d at 787 (quoting Floeting, 192 Wn.2d at 861). " '[S]exual harassment is a form of sex discrimination' " Id. at 792 (quoting Floeting, 192 Wn.2d at 853).

"Having held that one form of intentional sexual misconduct constitutes sex discrimination, it logically follows that other forms of intentional sexual discrimination, including physical abuse and assault, also constitute sex discrimination." Id. at 792-93. It is undisputed that Lansana was PRVOAIL's employee, so the WLAD imposes strict liability on PROVAIL for sexual abuse by Lansana. The appropriateness of summary judgment turns on whether A.S. met her initial burden of showing the absence of a genuine issue of material fact as to whether Lansana committed sexual abuse towards her, and, if so, whether PROVAIL responded with evidence showing "a genuine issue of material fact . . . where reasonable minds could differ on the facts controlling the outcome of the litigation." Ranger Ins. Co., 164 Wn.2d at 552.

A.S. bore the burden of proof. She based her motion on facts that PROVAIL admitted in discovery were true. In its CR 30(b)(6) testimony given in discovery, PROVAIL's community living/home and lifestyle program director, Amal Bennani-Grabinski, agreed that a sexual assault occurred:

> Q. Okay. And so what are the reasons supporting your agreement that the sexual assault of A.S. by Jefferson Lansana occurred?
> [Defense's counsel]: Object to form, and beyond the scope.[11]
> A. Why do I agree with [Adult Protective Services] and Department of Health's substantiation specifically?
> BY [Plaintiff's counsel]:

---

[11] With regard to the stated objections to scope, the appellate record does not contain a copy of the CR 30(b)(6) notice in response to which Grabinski testified as PROVAIL's corporate designee. In the superior court, PROVAIL did not move to strike or seek to have its scope objections determined for purposes of summary judgment. Accordingly, Grabinski's testimony as PROVAIL's designee is properly before the court.

Q.      Yeah. Why does PROVAIL agree that the rape occurred?

[Defense's counsel]: Object to the form.  Beyond the scope.

A.      I believe that at least two different, if not three different investigations were conducted by people who are more qualified than I am to conduct investigations.  I believe that they found evidence to support A.S.'s claim.

So I have to believe that those substantiations were appropriate.  It's not been my experience that any of those entities substantiate things without having a factual basis.

I believe that A.S. reported the same thing consistently every time she spoke with Residential Care Services or Adult Protective Services or Department of Health.  So I have to believe that her story was consistent.

By pointing to PROVAIL's own testimony agreeing that Lansana sexually assaulted A.S., A.S. met her burden as the moving party seeking summary judgment, and shifted the burden to PROVAIL to come forward with evidence showing a genuine issue of material fact.

PROVAIL argues there is a fact question about "whether Mr. Lansana ever penetrated [A.S.'s] vagina with his penis since [A.S.] could not physically see what he was doing."  To the extent PROVAIL suggests that A.S. reported events she did not perceive, it takes her testimony out of context.  In her deposition testimony on February 20, 2024, although A.S. stated she could not see aspects of the assault, she explained that she felt what Lansana was doing:

Q      Am I correct that you weren't able to see, then, what was happening down by your vagina?
[Plaintiff's counsel]:  Object to the form
THE WITNESS:      No, I couldn't.  No, I couldn't.
By [Defense's counsel]:  (Continuing)
Q      Were your feet and legs still positioned in your chair as they were when you were sitting up?
A      Not at that time.  Not at that time.
Q      How were your feet and legs positioned at that time?
A      Up and straight.  Up and straight.

Q    Your legs and your feet straight out as if you were lying on a bed, for instance?

A    Yes.

Q    Okay. Were they still positioned within the chair as they would be when you were sitting up, though?

A    Yes.

Q    When—after you maneuvered your chair up and back, what happened next?

A    He was on top of me. He was on top me.

Q    Did he say anything at that time?

A    No.

Q    Can you give an estimate of how long he was on top of you?

A    About five—five minutes.

Q    Did you ever see where his hands were?

A    Yes.

Q    And where were they?

A    On the sides my chair. On the sides of my chair.

Q    Do you know where his knees were positioned?

A    Almost on top my knees.

Q    And you couldn't tell at that time whether his penis was in your vagina? Is that right?

[Plaintiff's counsel]: Object to the form of that question.

THE WITNESS:    I could feel—I could feel it.

By [Defense's counsel]:    (Continuing)

Q    You just couldn't see it?

A    Yes.

Q    Is it possible you could feel his penis rubbing between your legs and near your vagina?

A    Yes.

ER 701(a) permits a witness to testify to things "rationally based on the perception of the witness." Contrary to PROVAIL's characterization, A.S. did not testify that she did not know what happened to her. Her inability to see some of what she otherwise perceived happening to her does not support a reasonable inference on this record that no sexual assault occurred.

PROVAIL also argues that A.S.'s word choice suggests a question about whether any sexual assault occurred. PROVAIL says that, in reporting the incident to her husband, A.S. said " 'she thought she had sex' " and did not use the terms

"assaulted, raped, or anything of the kind." (Internal quotation marks omitted.) In A.S.'s deposition on February 20, 2024, she testified,

> Q        Is it true that, when you went to T.S.'s room, you said, "I think I just – I think I just had sex"?
> A        Yes.
> Q        Is that because at that time you weren't sure because you couldn't see what was going on?
>                [Plaintiff's Counsel]: Object to the form.
> A        Yes.

In the deposition testimony on February 23, 2024, A.S. testified,

> Q        Okay. Am I correct that what you reported about your allegations about Mr. Lansana, what you reported to or reported was the statement you made to T.S. was where you thought you just had sex; correct?
> A        Yes.
>        . . . .
> Q        Do you recall your testimony from the other day where you agreed there was a time that you didn't know whether his penis was in your vagina? Do you remember that testimony?
> A        Yes.[12]

PROVAIL relies on this testimony apparently to suggest that because A.S. reported she "thought" she had sex, she was in doubt about whether she had been assaulted at all. However, this testimony does not support a genuine inconsistency or question about whether A.S. testified she perceived sexual contact, even if the evidence permits different inferences about the extent of the sexual contact. A.S.'s testimony as a whole does not support a reasonable inference that no sexual assault occurred.

---

[12] The question and answer PROVAIL provided to attempt to defeat summary judgment was the question "Do you remember that testimony?" and the answer "Yes." PROVAIL did not provide testimony in which A.S. denied knowing whether she had suffered any specific sexual contact.

PROVAIL also points to the Shoreline police report, which, in a narrative summary provided by Thompson, states, "[A.S.] smiled as I introduced myself. She was not crying and seemed perfectly normal, although I do not know her normal mannerisms and baseline emotional state." It continues, "I asked [A.S.] if she had any bleeding from the incident and she said, '[N]ot sure.' " And, "I did not see any obvious stains, no obvious blood droppings, or other bodily fluids on the floor or anywhere in the room." During Thompson's deposition, he testified that he did not take the above statements from his report as evidence that "something didn't happen."

Finally, PROVAIL points to Dr. Miller's report, which states, "Given the narrative of A.S., immediately after the assault there would almost certainly be a significant amount of internal vaginal DNA from the penis of Lansana after ~15 minutes of unprotected intercourse, which would likely still be largely present 9.5 hours later; this is not detected." Dr. Miller's report also states, "[I]t is possible that the DNA detected on the breasts and perineal/vulvar samples were from the basic care provided by the staff, including Jefferson Lansana." And, "the time and mechanism whereby any of the foreign DNA was transferred to A.S. is undetermined."

Taken together in the light most favorable to PROVAIL, A.S.'s agreeing to certain characterizations during her deposition, police reports of her mood and mannerisms hours after the assault, and inconclusive DNA evidence do not do more than raise possible questions about the extent of the sexual contact that occurred, but not about whether some amount of sexual contact occurred. This

evidence does not create a genuine issue of material fact about whether a sexual assault occurred, as A.S. promptly and consistently reported, as investigating authorities concluded, and as PROVAIL agreed.

2

Pointing to evidence it argues shows A.S. may have consented to the specific act of Lansana's touching her breasts,[13] PROVAIL argues A.S.'s consent negates a claim of sex discrimination under the WLAD. A.S. argues consent is not a defense to discrimination under the WLAD under these circumstances. We conclude that, where the elements of a WLAD claim are otherwise met, WLAD liability exists regardless of consent when an employee of a program authorized under chapter 71A.12 RCW engages in sexual abuse against a vulnerable adult receiving services from the program.

In Christensen v. Royal School District No. 160, 156 Wn.2d 62, 67, 124 P.3d 283 (2005), the court addressed whether the school district could assert comparative fault as an affirmative defense when a 13 year old student engaged

---

[13] PROVAIL's consent theory relies on the most tenuous of inferences. In A.S.'s deposition testimony on September 15, 2023, PROVAIL asked, "I wanted to know if you remember what you said to him when he said is it okay." A.S. answered yes. PROVAIL asked, "And when you said that did you say it on your pad or were you—did you say it by nodding your head?" A.S. answered, "I shaked my—I shaked my head." In A.S.'s deposition testimony on February 23, 2024, PROVAIL asked, "Did he ask if it was okay one to five times?" A.S. answered, "Yes." A.S.'s answers may be read to agree to no more than that (1) she did remember Lansana asking if it was okay, and (2) he asked if it was okay one to five times. It is only PROVAIL's follow-up question in which the questioner asked about when A.S. "said *that*" that, by the logic of the question, "*that*" would refer to A.S. having offered Lansana the statement "yes," as opposed to A.S.'s previous answer "yes" meaning only that she *remembered* what she had said. PROVAIL provides no deposition testimony in which A.S. clearly said she consented to any sexual contact by Lansana.

in voluntary sexual activity with her adult teacher. Id. at 65-66. The school district argued that the student had a duty to protect herself against sexual abuse and she ignored that by entering a sexual relationship with the teacher. Id. at 67. The court rejected the district's argument, concluding a defense of comparative fault based on the child's consent in a civil action for sexual abuse was unavailable because the legislature had adopted criminal statutes denying a consent defense based on the child's consent. Id. The court reasoned that "the societal interests embodied in criminal laws protecting children from sexual abuse should equally apply in the civil arena when a child seeks to obtain redress for harm caused to the child by an adult perpetrator."[14] Id.

The criminal statutes the court relied on in Christensen, RCW 9A.44.073 to .096, proscribe sexual conduct with minors without permitting minors to consent to such conduct. Id. at 67. PROVAIL points out that the criminal statute under which Lansana was charged, RCW 9A.44.050(1)(d), states that a person is guilty of rape in the second degree when the perpetrator is a health care provider and the victim is a client or patient, and the sexual intercourse occurs during a treatment session, consultation, interview, or examination, but allows an affirmative defense "that the client or patient consented to the sexual intercourse with the knowledge that the

---

[14] PROVAIL argues that, under Christensen, "although the fact of consent could not serve as a comparative fault defense, it was a fact that could result in a jury finding for defendant on negligence." Christensen explained the district was not barred "from claiming at trial that it was careful in hiring and supervising the child's teacher and, thus, was without negligence." 156 Wn.2d at 71. In upholding the superior court's ruling on summary judgment establishing PROVAIL's liability under the WLAD, we do not address in this interlocutory review the admissibility of any evidence on any issue to be determined subsequently.

sexual intercourse was not for the purpose of treatment."[15]   This distinguishes Christensen to the extent that the criminal statute under which Lansana was charged does not proscribe sexual conduct with an adult regardless of consent analogously to the criminal statutes proscribing sexual conduct with minors.

But, as in Christensen, another statute defines sexual conduct by Lansana towards A.S. as "sexual abuse" regardless of consent.   A reviewing court may affirm the trial court's grant of summary judgment "upon any theory established by the pleadings and supported by the proof, even if the trial court did not consider it." LaMon v. Butler, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989).   Relevant here, the legislature has found "some adults are vulnerable and may be subject to abuse . . . by a . . . care provider, or other person who has a relationship with the vulnerable adult."   RCW 74.34.005(1).   As an adult woman with cerebral palsy, A.S. qualifies as a vulnerable adult.   RCW 74.34.020(21)(c) (" 'Vulnerable adult' includes a person: . . . [w]ho has a developmental disability as defined under RCW 71A.10.020.); RCW 71A.10.020(6) (" 'Developmental disability' means a disability attributable to . . . cerebral palsy.").   By statute, "sexual abuse" includes "*any sexual conduct* between a staff person, who is not also a resident or client, of a facility or a staff person of a program authorized under chapter 71A.12 RCW, and a vulnerable adult living in that facility or receiving service from a program authorized

---

[15] Although to the extent of our record Lansana was not charged under this provision, the superior court looked to RCW 9A.44.050(1)(f)(i), under which, in relevant part, a person commits rape in the second degree when the victim is a vulnerable adult and the perpetrator has a "significant relationship" with the victim. The definition of "significant relationship" comprehensively includes several provider-patient relationships, but excludes "a consensual sexual partner."   RCW 9A.44.010(15)(c).

under chapter 71A.12 RCW, *whether or not it is consensual.*" RCW 74.34.020(2)(a) (emphasis added).

PROVAIL comes within this provision. The legislature authorized the secretary of Social and Health Services, RCW 71A.10.020(13), to issue payments to residential service providers contracted with the Department of Social and Health Services (DSHS). RCW 71A.12.020(1), 040(10). PROVAIL entered into a residential services contract with DSHS. The contract requires PROVAIL to provide support services in accordance with chapter 388-101 WAC and chapter 388-101D WAC. These chapters implement and are authorized by chapter 71A.12 RCW. See WAC 388-101-3010, -3020(2); WAC 388-101D-0020. PROVAIL acknowledges "[b]y name and by contract" its supported living services are "certified community residential services." PROVAIL qualifies as a program authorized under chapter 71A.12 RCW. As in Christensen, Lansana's sexual contact with A.S. was defined as sexual abuse by law regardless of consent, and it therefore amounts to discrimination against A.S. in violation of the WLAD.

Affirmed.

_Birk, J._

WE CONCUR:

_Díaz, J._          _Mann, J._

25